**David WILLIAMS, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 88 Civ. 1695 (BN).**

United States District Court,
S.D. New York.

Sept. 19, 1990.

Harley & Browne (J. Austin Browne and Bridget Asaro, of counsel), New York City, for plaintiff.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Ellen B. Silverman and Diana J. Hassel, Asst. U.S. Attys., of counsel), New York City, for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the Court of International Trade, sitting as a District Court Judge by designation:

## INTRODUCTION

David Williams, a former inmate confined at the Federal Correctional Institution at Otisville, New York ("Otisville"), seeks recovery of damages in the amount of $1,500,000 against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(d), 2671, et seq. for a below-the-knee amputation of his right leg. During his incarceration at Otisville, Williams was under treatment by the institution's medical staff for diabetes mellitus and developed a bacterial infection in his right foot. Plaintiff sues for alleged malpractice by defendant's Chief Medical Officer and his staff in misdiagnosing and improperly treating his infection, which led to advanced infection culminating in gangrene necessitating a below-the-knee amputation of his right leg on September 30, 1985. Williams was 48 years of age at the time of the amputation.

Williams claims that the bacterial infection which led to the amputation of his right leg entered his foot through either an abrasion caused by the improperly fitted institutional boots he was required to wear when he first arrived at Otisville in February 1985 or through a fissure caused by a fungal infection between his toes (athlete's foot) that was not detected by the medical staff because his feet were not properly examined to rule out infection.

Defendant concedes that Williams' bacterial infection led to gangrene in his right leg, but denies that the infection resulted from either Williams' institutional boots or from a fungal infection. According to defendant, Williams' foot infection was blood-borne and gangrene was primarily the result of complications incident to his diabetic condition (diabetic neuropathy, microangiopathy and other vascular insufficiency). Further, insists defendant, Williams' diabetic complications were aggravated by heavy cigarette smoking, Williams' prior history of intravenous narcotic drug use and alcoholism, and by trauma to his right foot when he fell out of bed.

Defendant further contends that, in any event, the diagnosis and treatment of Williams' foot infection by the medical staff at Otisville met accepted standards of

medical practice and treatment in that community at the time.[1]

Defendant's liability for plaintiff's misfortune revolves around the resolution of complex medical issues relating to the etiology of plaintiff's gangrene and the credibility of conflicting expert testimony relating to those issues.

In the early stages of a foot disease, the etiology of which may be obscured by the pervasive effects of a chronic disease like diabetes, treatment modalities are frequently a "judgment call" on the part of the clinician or surgeon. Nonetheless, treatment of diabetic foot disease is subject to some rather well defined standards. Williams argues that defendant was negligent in the diagnostic and treatment modalities provided to him at Otisville in regard to his infected foot, and as a consequence he suffered the amputation of his right leg below the knee.

For the reasons that follow, judgment is entered for plaintiff.

## THE RECORD

The record in this case is voluminous and complex, consisting of the transcript of the oral testimony of three witnesses for plaintiff and three witnesses for defendant in a six day bench trial, five loose-leaf binders comprising Williams' medical chart (much of which is illegible) and other records and reports covering his medical history and treatment from 1980 to 1989, four deposition transcripts, illustrative medical diagrams, and a stipulation of certain facts as set forth in the amended pretrial order.

Not surprisingly, much of the evidence adduced by the parties through their well qualified medical experts is highly technical and sharply conflicting on the pertinent factual issues. The court's view of the credibility of the witnesses for both parties and weight accorded their testimony is critical in resolving these factual issues and in determining whether plaintiff has met his evidentiary burden of establishing his claims by a preponderance of the evidence.

At trial, in addition to his own testimony, plaintiff presented the testimony of the following: an adverse witness, Stuart Gessleman, who was an uncertified physician's assistant ("PA") (Gessleman failed his examination (Tr. 147)) employed by defendant at Otisville from January 1982; and Dr. Jere W. Lord, Jr. Dr. Lord, whose professional credentials are quite impressive,[2] was a highly credible witness and his testimony is given great weight.

The Government adduced as fact witnesses Dr. John B. Ellison and Francis Coleman. Dr. Ellison is a board certified general surgeon affiliated with the Horton Memorial Hospital, a private hospital in Middletown, New York, and is the surgeon who amputated Williams' right leg on September 30, 1985. Coleman was employed as a physician's assistant at Otisville from 1983 to 1988. Defendant also presented as

---

1. On April 28, 1987, pursuant to 28 U.S.C. §§ 1346(d), 2671, *et seq.*, plaintiff filed an administrative tort claim with the Federal Bureau of Prisons, which denied the claim by memorandum dated November 2, 1987. Plaintiff filed this action within six months of that denial (Amended Joint Pretrial Order, Agreed Findings of Fact, par. 2).

2. Dr. Lord is a graduate of Johns Hopkins Medical School (1937); internship at New York Hospital (1937–38); residency in pathology at New York Hospital (1938–39); residency in general surgery (1939–44); licensed to practice medicine in New York State (1944); Board Certified in general surgery (1945); specialized in cardiac surgery (1946–60); Chief of Cardiac Surgery at Bellevue and New York University Hospitals; specialized in vascular surgery (1946–83); Chief of Vascular Surgery at Bellevue and New York University Hospitals (1946–60); Chief of Vascular Surgery at Cabrini Medical Center (1963–83); Professor of Clinical Surgery at New York University Medical School teaching primarily vascular surgery (1950–present); numerous hospital affiliations and consulting surgeon at many New York, New Jersey and Connecticut hospitals; published numerous medical papers, principally on vascular surgery; written chapters in ten textbooks on vascular surgery and vascular trauma.

Vascular surgeons treat diabetic patients with problems related to foot infections when those problems become complicated (Tr. 551–52). From 1940 to 1983 (when he retired), Dr. Lord performed over 100 leg amputations (Tr. 725). He readily conceded, and the court recognizes, that an amputation does not always mean that the preceding medical care was inadequate (Tr. 725).

an expert witness Dr. Carlton Boxhill, an internist specializing in diabetes. Dr. Boxhill, like Dr. Lord, has impeccable credentials.[3]

Portions of the following depositions were offered in evidence by the parties:

1. Dr. Albert O. Rossi, Chief Medical Officer at Otisville from August 1, 1980 to 1987 (Rossi Dep. Tr. 6, 14). At the time of his deposition, April 11, 1989, Dr. Rossi was employed by the Bureau of Prisons and assigned to Eglin Air Force Base Federal Prison Camp as Chief Medical Officer (Rossi Dep. Tr. 5).[4]

2. Jayne Vander Hey–Wright, PA at Otisville since June 24, 1985.

3. Frederick Rochacewicz, PA at Otisville from May, 1985 through August 1988. At the time of his deposition, July 28, 1989, Rochacewicz was employed by the Bureau of Prisons at the Federal Correctional Institution at Oxford, Wisconsin (Rochacewicz Dep. Tr. 3–4).

4. Jacob Garcia, PA at Otisville from May 1985 to the present. He has a 1983 medical degree from Universidad Pais Vasco, Bilboa, Spain, but did not serve an internship, received no further medical training and was never licensed to practice medicine in the United States or elsewhere (Garcia Dep. Tr. 5–7, 9). Garcia arrived in the United States in 1983. Prior to his employment as a PA at Otisville between 1983 and 1985, Garcia was employed in the medical records department of a hospital.

Otisville was Garcia's first position involving the care and treatment of patients (*Id.* at 10).

The court has carefully reviewed the testimony of the six witnesses at trial, the depositions, the stipulated facts, the numerous documentary exhibits, and the thorough post-trial proposed findings of fact and conclusions of law submitted by counsel for the parties, and makes the following findings and conclusions, in accordance with Rule 52, Fed.R.Civ.P.:

## FINDINGS OF FACT

### I.

*Williams' general personal history and the background of this litigation*

At the time of trial, Williams was 52 years of age (born August 7, 1937) (Tr. 12) and in 1979 at the age of 42 had been diagnosed as having adult onset diabetes mellitus (Tr. 22). Williams, a former drug user (until 1978), has spent a substantial portion of his adult life in the state and federal prison systems for conviction of various felonies, including possession of narcotics (Tr. 12, 40, 86, 104–05, 119). He entered the federal correctional system in 1978 (Tr. 83).

During periods when he was not incarcerated, Williams held short term jobs as a delivery clerk, stock clerk and construction worker, earning from $20.00 to $150.00 per week. (Tr. 12–20). Following a conviction

---

**3.** Graduated from Columbia University College of Physicians and Surgeons (1968); licensed in New York State (1969); residency in internal medicine at St. Lukes–Rossevelt Hospital Center in New York City; fellowship in endocrinology and metabolism, Yale Medical School (1974–75); Board Certified in Internal Medicine and Endocrinology (1973); Recertified in internal medicine (1980). Dr. Boxhill specializes in the primary care of diabetic patients in New York City (one-half of his private patients are diabetics and suffer from endocrine disorders); he also treats indigent diabetic patients and serves as a consultant without salary at the diabetic clinic at St. Lukes–Roosevelt Hospital. Dr. Boxhill also is an Associate Clinical Professor of Medicine at Columbia University College of Physicians and Surgeons and teaches medical students and the medical staff at the hospital in the care of diabetics. This case was his first experience in testifying as an expert witness. Al-

though the court gives more weight and credibility to many of the opinions and conclusions of Dr. Lord that were in direct conflict with those of Dr. Boxhill, it is only fair to say that Dr. Boxhill testified in a straightforward and professional manner, and finds that much of his credible testimony actually buttresses plaintiff's case.

**4.** Dr. Rossi graduated from the College of Physicians and Surgeons of Columbia University in 1949 and was licensed to practice medicine in New York State in 1950. Dr. Rossi has been Board certified (specialty not identified), practiced family medicine and has extensive experience in mental health and psychiatry (Rossi Dep. Tr. 10–12). As Chief Medical Officer at Otisville, Dr. Rossi was responsible for the care and treatment of diabetics and other chronically ill patients.

for armed bank robbery in 1980, Williams commenced serving his sentence of fourteen years at the United States Penitentiary in Leavenworth, Kansas (Tr. 20, 117, Deft's Exh. 1). Plaintiff's education terminated at the equivalent of the ninth grade in 1987 while imprisoned at Leavenworth (Tr. 11–12).

Williams was a former narcotic drug user: he smoked marijuana cigarettes in 1958–59 (Tr. 41); he "mainlined" (injected himself intravenously in his arms and legs) and "snorted" heroin (through the nose) during the period of approximately 1960 to 1970; and also used cocaine periodically until 1978 (Tr. 40–2, 106). In addition to using narcotics, Williams heavily consumed alcohol, occasionally to the point of intoxication and unconsciousness, starting at the age of 16 years and continuing until 1978 when he was 41 years of age (Tr. 38–9, 109–110). Along with the use of narcotics and alcohol, Williams began smoking at the age of sixteen, and at various times he smoked 20 or more cigarettes per day. At the time of trial, Williams had reduced his cigarette consumption to some 10 cigarettes per day (Tr. 36–37).

Sometime between 1978 and 1980, plaintiff was initially diagnosed as having diabetes mellitus based upon abnormal test results of a urine analysis performed at the Medical Department of the New York Metropolitan Correctional Center. Williams was also diagnosed by the prison medical staff at Leavenworth as a diabetic (Tr. 21–22). In 1981, Williams was prescribed insulin treatment while at Leavenworth, but after about a year he was changed to an oral antidiabetic treatment, i.e., Diabenese, 250 mg. twice per day. Oral antidiabetic medication and dieting effectively controlled his diabetes during his incarceration at Otisville.

Following Williams' amputation at Horton Memorial Hospital in Middletown, New York in September 1985 and a rehabilitation period of several months at a federal facility in Springfield, Missouri ending in January, 1986, Williams returned to Otisville where after a brief period of "medical unassignment," he worked at cleaning and repairing furniture (Tr. 112–113).

In the 1987 to 1989 period, Williams was incarcerated in successively lower security federal correctional institutions at Danbury, Connecticut and Loretto, Pennsylvania, and finally in a halfway house located at Philadelphia, Pennsylvania where he resided for about two months. Plaintiff was then paroled on May 15, 1989 to the Southern District of New York and at the time of trial resided with his mother in New York City. Although Williams had not been a drug user for more than ten years, the terms of his parole required that Williams enroll in a drug after-care program for one year, which he attended twice a week.[5]

Plaintiff commenced the instant medical malpractice action against the United States on March 11, 1988 while still a federal prisoner. Williams claims that at Otisville, the government provided him with improperly fitting shoes and negligent medical care regarding the diagnosis and treatment of his foot infection, all of which allegedly led to gangrene and the below-the-knee amputation of his right leg on September 30, 1985. Consequently, Williams' medical history during his incarceration at Otisville, and his subsequent hospitalization and rehabilitation will be the main focus of the Findings of Fact.

II.

*Williams' pertinent medical history*
February, 1985

At age 48, Williams was transferred from Leavenworth, Kansas to Otisville on February 11, 1985 (Tr. 21).[6] Otisville provided its inmates with an "in house" medical staff, and commencing on February 13,

---

5. While Williams admitted at trial that he had used heroin and cocaine in the 1960s, and was convicted of possession of a controlled substance in 1979, there is no evidence that he used these drugs during the period of his incarceration or after his release on parol.

6. Plaintiff was imprisoned at Otisville for various periods of time from February 11, 1985 through March 17, 1988 (Amended Pretrial Order, Agreed Findings of Fact, par. 5).

1985, and from time to time throughout his incarceration at Otisville, plaintiff received care and treatment at the institution, as reflected in his medical chart maintained by the institution (Amended Pretrial Order, Agreed Findings of Fact, par. 8). The Chief Medical Officer at Otisville in 1985, Dr. Rossi, was assisted by seven physician assistants and six other medical support staff personnel (Tr. 355). Dr. Rossi was the only physician assigned full time to Otisville, but outside medical specialists were also called in by the Institution periodically as needed (Tr. 355, 359, 365–66).[7] Significantly, no outside medical specialist was ever called in for consultation at Otisville concerning Williams' foot problems.

For diabetic inmates, Otisville provided a special clinic which monitored their fasting blood sugar levels on a monthly basis, prescribed medications, and furnished test tape for inmates to self-monitor the sugar level in their urine (Rossi Dep. Tr. 25–6; Tr. 357–58, 367–68). Additionally, Otisville provided special diets for diabetic inmates (Tr. 359–60).

Williams was known by the medical staff at Otisville to be diabetic when he arrived, and was immediately assigned to the diabetic clinic and his condition evaluated (Amended Pretrial Order, Agreed Findings of Fact, par. 6; Tr. 33). When Williams was transferred to Otisville in February 1985, he was using up to 500 mg. of Diabenese per day, an oral medication for controlling diabetes that had been prescribed for him by the medical staff at Leavenworth (Tr. 21–22). Williams' blood sugar and urine tests indicated that during his incarceration at Otisville Williams' diabetes was generally kept well under control. Therefore, Williams was continued simply on Diabenese coupled with a diabetic diet regimen.

With but few exceptions, Williams attended the mandatory monthly appointments at the diabetic clinic from the time of his transfer to Otisville in February 1985,[8] his blood pressure was recorded and he was tested for his fasting blood sugar. Williams was also frequently seen by the medical staff at sick calls (Joint Exh. 1A, G001064–G001072).

Upon his arrival at Otisville, Williams was wearing properly sized eight street shoes. But despite his diabetic condition, he was furnished in their place and required to wear ill-fitted size 10½ institutional work shoes (Amended Pretrial Order, Agreed Findings of Fact, par. 10; Tr. 22, 86). Not until March 1, 1985 was Williams able to obtain a size 9½ work shoe from the prison's "clothes box" (apparently clothing discarded by the inmates); and not until April 1, 1985, did Williams obtain correctly sized 8½ institutional shoes from another inmate (Tr. 22–3, 87).

June 6, 1985

An entry in Williams' medical chart for this date shows a diagnosis of "Dermatophytosis [fungal infection on the skin] of both palms reflecting a chronic tinea [fungal] infection of toes." (Joint Trial Exh., 1A, G001068) (Tr. 666). An antifungal medication (Desitin) was prescribed for nightly application to Williams' feet, and "also [the] insoles to both shoes." *Id.*

In his deposition, Dr. Rossi testified that dermatophytid all over Williams' hands, were "systemic manifestations of a chronic fungus, *usually from the feet.*" Dr. Rossi explained: "the reason you see dermato— little circular—phytids here is because we are created with the same skin. The palms are the same skin as the soles of the feet. And it's very common that *a diagnosis can be made of the fungus infection of the*

---

**7.** In fiscal year 1985 the average daily population of inmates confined at Otisville was 629 and their median age was 36.1 years. *Statistical Report Fiscal Year 1985, U.S. Department of Justice, Federal Bureau of Prisons,* Table A–2. There is no claim by plaintiff that Otisville was understaffed in its medical unit in relation to the population and age of the inmates, and the court finds that Otisville was adequately staffed.

**8.** Beginning in April 1985, Williams failed to keep his scheduled appointments on three occasions: April 12, 1985, May 9, 1985 and July 11, 1985 (Tr. 192, Joint Exhs. 1A, G001065, G001067). However, Williams was seen by the medical staff shortly after those dates for prescriptions and other care, and his diabetes was well controlled.

*toes just by looking at one's palms"* (Rossi Dep. Tr. 43, emphasis added).

Further, regarding Dr. Rossi's first examination of Williams, Dr. Rossi noted: "scaling of both palms, reflecting, in my opinion, a chronic fungus infection of his toes"; by looking at Williams' feet, Dr. Rossi was able to connect the tinea infection on his hands with the same condition in his toes (Rossi Dep. Tr. 60).

June 18, 1985

Williams' prescription for Desinex was refilled, indicating continued treatment of his fungal infection. Despite the fact that there are no further entries in Williams' chart regarding his fungal infection, there is no evidence that the fungal infection was successfully treated and no longer a problem anytime after this date. Athlete's foot, even if successfully treated, readily recurs, and Dr. Lord believed that the problem persisted in September 1985.[9] Garcia testified at his deposition that fungal infections of the foot are a "very frequent malady in prisons" (Garcia Dep. Tr. 48). Garcia further testified with regard to Williams chronic tinea (athlete's foot), as noted on his chart for June 6, 1985, that most people who suffer from tinea infection in the prison, "can't get rid of it because every time they go the bathroom or take a shower, it usually goes on and on" (*Id.*).

July 1, 1985

Williams complained to the medical staff at the diabetic clinic that his institutional shoes were making his feet sore and giving him corns, and that when walking, he had pain in his calves (Joint Exh. 1A, G001066). Williams' request for new pair of size 8½ shoes was referred to Mr. Gard, the hospital administrator, by PA Vander Hey-

Wright (*see* Amended Pretrial Order, Agreed Statement of Facts, par. 11; Joint Exh. 1A, G001068; Tr. 89).

July 2, 1985

After a superficial clinical examination of Williams' feet, Dr. Rossi diagnosed Williams' foot problem as early polyneuritis of the calves (a dysfunctional condition of the nerves of the lower extremities) (Joint Exh. 1A, G001066). Other than squeezing Williams' calves with his hands, Dr. Rossi performed no specific neurological tests or examination that could have been used to rule out polyneuritis (Amended Pretrial Order, Agreed Findings of Fact, par. 12; Rossi Dep. Tr. 69–71), and it appears Otisville did not have the proper equipment for such testing (Garcia Dep. Tr. 54, 62, 83), except a reflex hammer and instruments for sensory touching (Rossi Dep. Tr. 147).[10] Dr. Rossi prescribed oral mega-doses of vitamins B1 and B6 for early polyneuritis, which Williams took for over two months without success.

During an examination of Williams' feet, Dr. Rossi noted on Williams' chart, "both nails [were] almost gone." According to Dr. Lord, this occurrence is usually indicative of a fungal infection (Tr. 694).

Dr. Rossi noted on Williams' chart under the July 2, 1985 entry that there was an orthopedic basis for the purchase of 8½C shoes (curvature of metatarsals) and authorized their purchase (Joint Exh. 1A, G001067). (When the shoes were actually ordered is not clear from the record, but it appears that Williams was not furnished these new shoes over two months until September 12, 1985, although Otisville had received them more than a month previous-

9. Regarding Williams' condition in 1985, the court gives no probative value to Dr. Boxhill's testimony that Williams had been seen by a dermatologist in 1980 or 1981 at Leavenworth, cultures of scrapings were negative for fungus, and the diagnosis was chronic dermatitis or an ichthyosis (drying of the skin). With regard to athlete's foot, this diagnosis in 1980 or 1981 is simply too remote in time to make any reasonable inference as to the absence of a fungal infection in Williams' feet in 1985, particularly when Dr. Rossi specifically diagnosed Williams as having a dermatophytosis [fungal infection of

the skin] of both palms, *reflecting a chronic tinea infection of the toes* on June 6, 1985 and Dr. Rossi prescribed an antifungal cream (Desinex), which was renewed on June 18, 1985.

10. Dr. Rossi explained that polyneuritis is one of the earliest signs encountered by the physician in the diabetic profile because diabetics are prone to lose the myelin sheaths of the nerve endings (Rossi Dep. Tr. 72). Dr. Rossi saw no need for neurological testing of Williams to confirm his diagnosis of polyneuritis (*id.* 72–3).

ly on August 6, 1985 (*see* exh. 4, Tr. 172, Joint Exh. 1A, G001069)).

July 12, 1985

At sick call, Williams complained to PA Vander Hey–Wright of continued pain and tightness in his legs. The PA issued to Williams size 8 shoe inserts to relieve his pain, and continued Williams on his megadose vitamin therapy for early polyneuritis although Williams complained that the vitamins were not alleviating his pain (Amended Pretrial Order, Agreed Statement of Facts, par. 13). PA Vander Hey–Wright made no examination of Williams' legs or feet (Rossi Dep. Tr. 74).

September 6, 1985

Significantly, for the first time, Williams complained to the medical staff *specifically of pain in his right foot* (Joint Exh. 1A, G001068).[11] Suspecting that Williams was continuing to suffer from polyneuritis in accordance with the previous diagnoses, P.A. Jacob Garcia made a specific neurological examination of Williams' right foot using a reflex hammer, pin and brush and found tenderness on the plantar surface (the sole) of the right foot at the base of the third toe, but that loss of sensitivity was "superficial in this case" (Garcia Dep. Tr. 28–9).[12] Garcia also used his hands to apply pressure to Williams' feet to ascertain the location of painful areas; the only abnormality he found from his neurological examination was tenderness (soreness) (*Id.*). *Garcia was unable to detect any evidence of polyneuritis, vascular problems, infection or other pathology in Williams' right foot and made no diagnosis* (Garcia Dep. Tr. 32, 34, 38).

Despite Williams' history of chronic tinea (fungal) infection (*see* Joint Exh. 1A, entries of July 6 and 18, 1985, G001068), Garcia failed to make a careful examination of the web spaces between the toes of Williams' feet for breaks in the skin that could provide an entry point for an infection. Moreover, Garcia did not take Williams' temperature or perform any other examination to rule out infection (Garcia Dep. Tr. 39–40). Garcia prescribed Motrin for arthritic pain[13] and elevation of the right leg at night (Amended Pretrial Order, Agreed Statement of Facts, par. 16); Garcia authorized Williams to be "off work" for one day because Williams could not stand for long periods of time as required by his prison job (Joint Exh. 1A, G001068; Garcia Dep. Tr. 27).

September 9, 1985

Gessleman examined Williams at the health services clinic. According to the entry in his medical chart, Williams complained of "neurotype pain" in his feet; Gessleman examined Williams to rule out diabetic neuritis, but failed to perform any neurological testing whatever. Gessleman did not consider infection as a possible cause of Williams' pain since based on the examination he performed, Williams' feet appeared to look "normal for him" (Tr. 166). Gessleman observed no swelling, redness, unusual calluses, cuts or lacerations, but failed to take Williams' temperature or examine the web spaces of Williams' feet for breaks in the skin despite his history of fungal infection. Gessleman continued Williams on the megavitamin therapy prescribed by Dr. Rossi for diabetic neuritis and ordered Williams to be "medically unassigned" for five days. Accordingly, Williams was not required to report for work, but had the freedom to go anyplace in the compound (Rossi Dep.Tr. 84) (Tr. 164–65, Joint Exh. 1A, G001068).

Another entry on Williams' chart for September 9, 1985 by Dr. Rossi makes refer-

---

**11.** Williams used the term "feet" when he meant "foot" (*see e.g.,* Tr. 65), and consequently his testimony with regard to his symptoms and complaints is frequently unclear as to whether he was referring to both feet or solely his right foot.

**12.** Garcia subsequently conceded that very sophisticated "neural function" testing is necessary for a definitive diagnosis of neuritis, but

that Otisville did not have the facilities for such testing (Garcia Dep. Tr. 54–5, 62).

**13.** Dr. Rossi explained that Motrin is a potent acetylsalicylic acid drug (more effective than aspirin), and is used for degenerative joint disease, arthritis, or arthritic deformities and limitations, rheumatic pains that involve muscle, muscle sprains, and of course, headaches (Rossi Dep. Tr. 146).

ence to "intermittent claudication," but there was no examination of Williams' Dorsalis Pedis pulses or any other vascular testing or examination of Williams' feet that would have confirmed such diagnosis (*Id.;* Rossi Dep. Tr. 81)[14] Dr. Rossi granted Williams the use of a cane with which Williams was able to walk by leaning on it with both hands and maneuvering his right foot at different angles to mitigate the pain.

September 12, 1985

Williams was next seen by PA Fred Rochacewicz at sick call on Thursday due to Williams' persistent complaints of soreness and tenderness on the soles of his "feet" and his request for crutches for ambulation (Joint Exh. 1A, G001069). Rochacewicz noted mild tenderness on the plantar surface of the *right foot in the area of the fifth toe,* a few hyperkeratotic (rough or horny skin) areas on the plantar surface of Williams' feet, but no ulceration or erythema (inflammatory redness) of the skin. Dorsalis Pedis pulses were palpable (indicating normal circulation in the Dorsalis Pedis artery in the feet).[15] Williams' request for crutches was denied. (Approximately one week later, Williams received a pair of crutches from PA Frank Coleman.)

Rochacewicz believed that early diabetic neuritis should be ruled out, but no specific neurological testing was done. Megavitamin therapy was continued, notwithstanding that Williams had received no beneficial results from such therapy after two months. New size 8½C shoes (which had previously arrived at Otisville more than one month earlier on August 6, 1985) were delivered to Williams at this point. Williams was advised to *reduce* (not stop)

his cigarette smoking (Joint Exh. 1A, G001069) and counselled in strict diet control. Williams was *referred to* Dr. Rossi because of his continuing complaints of foot pain (Amended Pretrial Order, Agreed Statement of Facts, par. 19, Rochacewicz Dep. Tr. 55). (Dr. Rossi did not see Williams until after the weekend, four days later, on Monday, September 16th).

September 15, 1985

On Sunday, plaintiff again complained to the medical staff of persistent tenderness and pain in his *right foot,* particularly the plantar surface. At this point in time, because of intense pain in his right foot, Williams was barely able to walk, even assisted by a cane. As characterized by Garcia, Williams had a "hard time walking" (Garcia Dep. Tr. 58, 63–4). Therefore, Garcia examined plaintiff in his cell and noted that there was tenderness on the plantar surface of Williams' right foot more generalized and diffuse than he had previously observed on September 6th (Garcia Dep. Tr. 55–57, 67). Garcia failed to do appropriate neurological testing, erroneously attributed Williams' pain to "early diabetic neuritis," prescribed Motrin for pain and relieved Williams from work for four days (Amended Pretrial Order, Agreed Statement of Facts, par. 20; Joint Exh. 1A, G001069). Additionally, Garcia failed to give due regard to the fact that Williams' complaints focused on his right foot and failed to rule out infection.

September 16, 1985

On Monday, four days after Williams had been referred to him, Dr. Rossi saw Williams who continued to complain of pain and tenderness in his *right foot,* particular-

---

14. Dr. Boxhill discredited Dr. Rossi's diagnosis of "intermittent claudication" on September 9, 1985, characterizing it as "inappropriate" because no prior vascular testing supported such diagnosis. However, Dr. Lord testified that Williams' complaints of pains in his calves in July and August 1985 were correctly diagnosed by Dr. Rossi as intermittent claudication (*see* discussion, *infra;* Tr. 257–58, 750–51). Additionally, Dr. Ellison, who amputated Williams' right leg, noted in his admission report of September 26, 1985 that Williams had "intermittent claudication characterized by pain on level and uphill walking" (Joint Exhs. 2 and 3, G275).

15. The dorsalis pedis pulse is the main superficial pulsation that can be palpated to determine whether blood flow through the leg vessels are entering through the dorsum of the foot. If the dorsalis pedis pulses are palpable, one can be assured that the toes are receiving adequate blood supply (Deposition of Dr. Rossi on April 11, 1989, p. 88 (Tr. 614)). "Since Williams had an intact dorsalis pedis pulse [in his right foot], one would be dissuaded from believing that there was a circulatory problem" (Tr. 591).

ly in the sole and arch areas, extending from the plantar surface to the medial ankle area. Dr. Rossi examined Williams' feet looking for an orthopedic problem in Williams' arches that could account for Williams' complaints, but Dr. Rossi found no orthopedic problem. Without any neurological testing or appropriate clinical examination of Williams' feet, Dr. Rossi simply attributed the pain to polyneuritis of diabetic origin (Rossi Dep. Tr. 96–7). *Suspecting that Williams was exaggerating his symptoms*, Dr. Rossi denied Williams the use of crutches, and seeing no emergency deferred his clinical evaluation of Williams' complaints pending a consultation with an internist specializing in oncology (cancer), Dr. Brooks, who visited Otisville approximately monthly (Tr. 360).[16] According to Williams' chart, Dr. Rossi *suspected that Williams was "feigning medical illness"* (Joint Exh. 1A, G001069) (Rossi Dep. Tr. 95–98), but nonetheless Williams was medically unassigned through September 27, 1985 (Amended Pretrial Order, Agreed Statement of Facts, par. 21).

Dr. Rossi explained that in his examination of Williams, he did not touch Williams' feet or calves or use any instruments in his examination, and "[s]eeing no area that resembled an orthopedic or bone defect, one has to again turn to [*i.e.*, assume] the diagnosis most probable in a diabetic, that of polyneuritis" (Rossi Dep. Tr. 96–97, Tr. 620).

In the evening, while in his cell, Williams noticed a discharge of fluid from the plantar surface of his right fifth toe. Williams attempted to stop as much of the exudate as possible with a tissue and waited until the following morning for treatment.

September 17, 1985

On Tuesday morning, Williams reported to the health services clinic again complaining of pain in his *right foot* and now additionally of drainage from the plantar surface. P.A. Coleman examined Williams' foot and found partial tenderness at the medial aspect of his Achilles tendon, that plaintiff's temperature was 99 degrees (slightly elevated), and Coleman found a negative Homan's Sign, indicating the absence in Williams' right leg of deep vein thrombophlebitis.[17] Nonetheless, Coleman's assessment was to rule out thrombophlebitis, and failed to consider infection as a possibility. Coleman palpated the cord in Williams' leg to check the circulation, prescribed Darvocet for pain (a "very powerful" narcotic analgesic, much stronger than Motrin) (Tr. 104, 121), daily warm soaks, directed Williams to keep his leg elevated, and gave Williams the privilege of using the "early chow line" (Amended Pretrial Order, Agreed Statement of Facts, par. 22).

Unfortunately, despite drainage, pain and slightly elevated temperature, Coleman failed to make a proper clinical examination of Williams' foot to rule out entry of an infection in the web spaces (Joint Exh. 1A, G001070, Tr. 370). Apparently unsure of his assessment and the seriousness of William's condition, Coleman referred him to Dr. Rossi (Tr. 371).

Shortly following Coleman's examination of Williams, Dr. Rossi examined Williams' right foot and found an "infectious discharge from below the right fifth toe" (Joint Exh. 1A, G001070), described in Coleman's deposition as "pus" (Tr. 395). There was a "fistula" (a tiny opening approximately the size of a ballpoint pen) at the point of the discharge (Tr. 371–72). In view of an apparent infection in Williams' diabetic foot, Dr. Rossi now became concerned and prescribed Keflex (an oral antibiotic) for ten days, ordered a white blood cell count and a culture be taken of the

16. Dr. Rossi intended to request that Dr. Brooks visit Otisville after three or four other prisoners needed to see Dr. Brooks (Tr. 98). How much delay in consulting on Williams' problem such scheduling would have entailed is not disclosed by the record. Why Dr. Rossi wished to consult with a cancer rather than diabetic specialist is inexplicable since cancer was never considered as a possible diagnosis.

17. Dr. Boxhill testified that PA Coleman attempted incorrectly to elicit the Homan Sign by active rather than passive dorsa flexion of the foot, and therefore, discredited Coleman's finding of a negative sign (Tr. 611–612.)

infectious discharge for identification and sensitivity testing by an outside laboratory (Roche Laboratories), and a "Diagnostic 800" blood analysis by Roche Laboratories (Amended Pretrial Order, Agreed Statement of Facts, par. 23; Tr. 373; Rossi Dep. Tr. 101; Garcia Dep. Tr. 88). Dr. Rossi was now quite concerned about Williams' problem, since as a diabetic patient Williams could not "afford to have infections in the small toes" (Rossi Dep. Tr. 112, 114; Garcia Dep.Tr. 92).

According to Coleman, culture results normally required 48 hours (Tr. 397–98), and therefore a report was expected by Thursday or Friday at the latest.[18] Sadly, Dr. Rossi took no steps to assure that would occur (Rossi Dep. Tr. 113), or gave any direction to Roche to expedite the report on the culture. Williams was instructed to take daily whirlpool soaks for his foot and elevate his leg (Joint Exh. 1A, G001070). With regard to the drainage, no surgical procedure was performed.

Despite clear indications that Williams had a severe foot infection and was in intense pain, Williams was required by Dr. Rossi to continue walking to the hospital several times a day (a distance of approximately two to three city blocks from his housing unit) for his medication, and to walk to the "early chow line" several times a day for his meals. Williams could hardly bear to put any weight on his infected right foot and necessarily had to hobble on crutches as best he could until September 22, 1985 when the pain became so overwhelming he was no longer able to ambulate to the hospital for his medication. Williams described his predicament in the following terms:

> At that time [when he had to report to the hospital for his medication] I was in so much pain that to travel any distance on the crutch I would have to stop. I was full of fever, sweating. By the time

I could reach the hospital it felt like I was going to faint. So I informed one of the PA assistants, Trueblood, that I wasn't going to continue to make the trip for medication because it took too much out of me, I couldn't make it, and he informed me that he would have one of the yard officers bring the narcotic [Darvocet] pill down to the unit.

Tr. 61–2.

Hence, even on Tuesday, September 17, 1985, when his foot infection became all but patently obvious, Williams was still required to walk rather than confined to absolute bed rest, or even admonished by the medical staff not to walk. "Early chow line" simply meant that Williams had the privilege of walking earlier to the cafeteria to obtain his meals (Rossi Dep.Tr. 116). Dr. Lord's testimony amply supports a finding that Williams' infection was significantly aggravated by continued walking. The spreading and intensifying foot pain coupled with such an overt sign of infection as drainage of pus, were important warning flags and symptoms of possible serious trouble down the road.

September 19, 1985

The entry in Williams' medical chart (Joint Exh. 1A, G001070) shows Coleman reported that the blood drawn on September 17th had an abnormally high white blood cell count of 16,100 (normal count is 4,000 to 10,000 (Tr. 396–97)). Such high white cell count coupled with the pus exudate from the fistula and severe pain in his foot, constituted a syndrome plainly indicative of a severe spreading infection and cellulitis in Williams' right foot. In light of Williams diabetic condition, an expedited report on a culture of the infectious organism and immediate appropriate surgical and medical intervention (as outlined *infra*) were indicated. Williams, however, was simply maintained on the oral antibiot-

---

**18.** September 17, 1985 was a Tuesday. Hence, by Coleman's estimate, the culture results should have been available by Thursday, September 19, 1985 or at the latest by Friday, September 20, 1985, depending upon the time of day when the culture was available for pick-up by Roche (Tr. 398). Coleman had no explanation as to why the report on the culture was not available until Monday, September 23, 1985, six days after it was taken, other than it was "up to the laboratory" (Tr. 399). Inasmuch as Dr. Rossi had decided to withhold outside consultation from Williams until a report on the culture, it is inexplicable why Rossi was willing to wait six days for a report, considering the apparent urgency of appropriate treatment.

ic Keflex pending a report from Roche on the culture, and the narcotic painkiller Darvocet. Although it was Thursday and hence had already been two days since the culture was sent to Roche, no effort was made by Dr. Rossi to expedite the report from Roche notwithstanding that he had expected a telephone report of the results within 24 hours of taking the culture (Rossi Dep.Tr. 113).

September 20, 1985

On Friday, no report from Roche had yet been received by Dr. Rossi. Notwithstanding the upcoming weekend, the Otisville medical staff did not contact Roche to ascertain whether a written or telephonic report could be expedited and obtained immediately.

Williams was still required to do substantial walking to obtain his medication and meals, and pending the laboratory report, was to receive only oral antibiotics and Darvocet.

September 21, 1985

On Saturday night, while attempting to get out of bed, Williams put weight on his painful right foot and fell (Tr. 495). However, there is no evidence his right foot was injured in any way by the fall.

September 22, 1985

Early Sunday morning, at 12:32 A.M., PA Gessleman was called by a guard to Williams' "housing unit" because Williams was now in intense pain, needed pain medication, but was not even able to walk to the "pill line" (Tr. 180–82, Joint Exh. 1A, G001070).

Gessleman found Williams' temperature significantly elevated (99.8 degrees), his right foot severely swollen, and there was a bloody discharge (reddish serosanguinous fluid, probably blood mixed with infectious material) from the plantar surface of the right foot, medially of the fifth toe. A very serious infection should have been highly suspect to medically trained personnel, and Gessleman correctly noted on Williams' chart to "rule out infection" (Tr.

181, 188, Joint Exh. 1A, G001070).[19] However, by now Gessleman thought that Williams' foot was too painful to manipulate his toes to make a proper examination of the web spaces where an infection could have entered. Gessleman provided Williams more Darvocet for pain and directed him to report to the sick line as soon as possible. Although Dr. Rossi was available, Gessleman did not call him (Tr. 190–91).

At approximately 9:30 A.M., Williams' right foot was now in obviously precarious condition. Garcia had been called to Williams' cell by a guard, and he observed that Williams had a warm right foot which was painful, red, had a tumor-like appearance, and was discharging infectious material (Garcia Dep.Tr. 72, 78–80). Williams was now diagnosed as having a right foot infection (Garcia Dep.Tr. 72–3).

Unfortunately, by this time, the infection had already spread extensively in Williams foot and was discharging below the fifth toe. Williams could no longer walk and was taken by a member of the medical staff in a wheel chair to the prison hospital and admitted (Tr. 194–95, Joint Exh. 1A, G001071, Garcia Dep.Tr. 72, 118). Williams was informed that arrangements were being made to transfer him to an outside hospital. While in the Otisville hospital, Williams received oral antibiotics (Keflex) for his infection, Darvocet for pain, leg elevation and whirlpool soaks.

By 4:30 P.M. on September 22, 1985, Williams' right foot continued to worsen and PA Rochacewicz observed a draining infectious material oozing through a fissure on the plantar surface at the fifth toe (Rossi Dep.Tr. 120). The Darvocet was simply *masking* Williams' pain to some extent, but he still had mild tenderness and swelling in his right foot. Williams' Dorsalis Pedis pulse was intact, indicating he still had normal circulation in his foot and therefore no vascular problem (Tr. 499, 528). Williams' condition was diagnosed as an infection in his right foot (Tr. 469). Dr.

---

19. In medical parlance, the term "rule out" means that a possible diagnosis for the patient's complaints must be considered and eliminated as the cause of the patient's symptoms (Rossi Dep. Tr. 92).

Rossi was informed of Williams' status and admission to the prison hospital, and Williams was to be seen by Dr. Rossi the following morning, Monday (Rochacewicz Dep.Tr. 62). Since no laboratory report had yet been received from Roche, Rochacewicz continued Williams on Keflex and Darvocet (Pretrial Order, Agreed Statement of Facts, par. 25; Joint Exh. 1A, G001071, Tr. 186–87).

September 23, 1985

PA Donald Moore monitored Williams' condition during the early Monday morning hours. Williams complained of pain and was given Darvocet and Keflex, but nothing else eventful occurred until 8:00 A.M. (Joint Exh. 1A, G001072). By 8:00 A.M. Williams was febrile, had a very high white blood cell count of 16,000 and marked cellulitis of the right leg with a suppurative drainage beneath the toes of his right foot, all indicative of a severe and spreading infection. It was also apparent that Williams' infectious condition in his right foot had substantially worsened in the previous 24 hours.

By that time, Dr. Rossi had received the results of the culture of the infectious discharge (taken six days before on September 17, 1985) by telephone from Roche, and the infectious bacterium was identified as E. Coli. Such organism is a normal inhabitant of the intestinal tract, but if it invades other tissues, "it is quite complicated to treat" (Rossi Dep.Tr. 113). Unfortunately, the type of E. Coli infecting Williams' foot had no sensitivity to the Keflex antibiotic that Williams had been given orally by Otisville since September 17, 1985. Testing showed that the E. Coli culture was sensitive only to the antibiotics Gentamicin, Tobramycin and Carbenicillin, each drug requiring the intravenous route of administration.

Dr. Rossi determined that Williams was in immediate need of intravenous antibiotic treatment. Otisville had no facilities for intravenous administration of antibiotics, and thus it became necessary to send Williams to an outside hospital immediately. Thus, on Williams' medical chart, there is an entry for September 23, 1985: *"medi-*
*cal basis for immediate hospitalization to have I.V. therapy through mainline since no peripheral veins available (old drug user)"* (Amended Pretrial Order, Agreed Statement of Facts, par. 28; Joint Exh. 1A, G001072). There is no indication on Williams' chart in the entries for either September 22 or 23, 1985 that Williams was diagnosed as suffering from any diabetic vascular disorder or diabetic neuritis. Williams was then transferred on that day to Horton Memorial Hospital, a private hospital in Middletown, New York, located near Otisville (Joint Exh. 2, at 1), *essentially for emergency treatment of the right foot infection by high-dose intravenous antibiotic administration of one of the antibiotics to which the E. Coli was sensitive.* There is no evidence that when Williams was transferred from Otisville to Horton on September 23, 1985 he suffered from any gangrene, although his infection was now in a very advanced stage and the chances of avoiding an amputation had declined precipitously from September 6, 1985 (Tr. 524).

To further compound Williams' difficulties and diminish what little chance remained of saving his leg by appropriate treatment, and following its not uncommon practice, Otisville transferred Williams to Horton Hospital without sending along his medical records or even a brief note by Dr. Rossi concerning Williams' E. Coli infection and the reason why Williams was being transferred to Horton (Rossi Dep.Tr. 128–130).

Williams entered Horton Hospital through the emergency room unaccompanied by any medical history from Otisville. Williams reported that he had been experiencing severe pain in his right foot for four weeks which was progressively worsening; that his right foot was inflamed and swollen; and that he was unable to walk on it. Williams testified that when he first arrived at Horton from Otisville, he was "in pain to the extent that if [he] had a pistol, [he] would have shot the foot off" (Tr. 132).

The Horton emergency room physician who initially examined Williams was able, from his clinical examination and question-

ing of Williams, to accurately diagnose Williams' condition as "severe cellulitis, infection of right foot" (Joint Exh. 2, at 2). No gangrene was evident at that point in time.

Later in the day on September 23, 1985, Williams was examined by a surgeon, Dr. John B. Ellison, who observed in his report of September 26, 1985 that Williams had "a swollen, painful right foot with considerable inflammation with blistering about the right small (fifth) toe and about the plantar surface of the foot and about the ankle."[20] No gangrene in Williams' foot was observed by Dr. Ellison at his initial examination of Williams. Dr. Ellison further noted in his report that Williams had intermittent claudication characterized by pain on level and uphill walking due to loss of circulation in the legs and feet; that Williams had *no obvious peripheral neuropathy since he could sense pain in the toes and feet;* and that bilateral (in both legs) femoral, but no distal pulses were noted in either leg.[21] This latter finding persuaded Dr. Ellison that Williams had an essentially ischemic condition causing tissue oxygen deficiency (Tr. 449). Such inschemia was due to an occlusion or blockage of the major arterial system in Williams' thighs just above the knees before it branches into the circulation that is necessary to nourish the calf and foot. Such circulatory blockage is frequently caused by an arteriosclerotic condition ("hardening" of the arteries or a build-up of deposits inside the arteries that eventually occludes them). Dr. Ellison's impression was: "Infection right foot, especially right fifth toe, Probable web space infection *ischemic in nature*" (emphasis added). Regarding the possible presence of infection, Dr. Ellison's impression at the time was that Williams' problem was due to loss of circulation, "and what infection was present was really a superficial, on the surface process" (Tr. 311–12, 314–15, Joint Exh. 3, G276). On admission to Horton, Williams' temperature was normal, but within one day it rose to between 100–101 degrees.

Tragically, when Dr. Ellison was treating Williams in September and October 1985, he admittedly had not received any of Williams' prior medical records from Otisville and was completely unaware that Williams had been diagnosed by Dr. Rossi

**20.** Dr. Ellison's initial observations concerning Williams' pain and the absence of peripheral neuropathy because Williams could sense pain in the toes and feet on admission to Horton was subsequently contradicted by him. In his "Discharge Summary" of October 7, 1985, Dr. Ellison notes: "There is certainly a sense of peripheral neuropathy, as the patient on admission had only modest to minimal complaints referable to a rather advanced ischemic and gangrenous process of his foot." Strangely, no gangrene in Williams' right foot was noted by the admitting physician at Horton, by Dr. Ellison when he first examined Williams, or by the medical staff at Otisville immediately prior to Williams' transfer to Horton. At trial, Dr. Ellison admitted that he did not know when the gangrenous condition in Williams' right foot first appeared (Tr. 349).

**21.** On September 23, 1985, before transferring Williams to Horton, Dr. Rossi found Williams' ankle swollen and the Dorsalis Pedis pulse in Williams' right foot difficult to feel "due to pressure of internal fluids" (Rossi Dep. Tr. 124). Hence, it is not surprising that Dr. Ellison also found the Dorsalis Pedis undetectable in Williams' right foot when he first examined him. However, the fact that Dr. Ellison also found no Dorsalis Pedis in Williams' left foot is difficult to explain. As observed by Dr. Boxhill in his report of August 4, 1989: "The inability to palpate Dorsalis Pedis pulses on 9/25/85 according to Dr. Ellison's recollection was a key reason for believing the arterial circulation had been interrupted. (Other examiners on 9/12 and 9/22/85 had stated those pulses to be intact.) It is understandable how the pulse in the right foot might have been lost since the infection and swelling of the tissues would dampen or dislocate that artery. However, it is difficult to see how the left foot would have lost its pulses in light of subsequent documentation of intact circulation in the left foot by doppler studies. It is also unclear why information about other pulses, popliteal or posterior tibial, was not sought or recorded. *If those pulsations had been observed intact, in the context or other clinical historical information from Otisville F.C.I. and signs pointing to infection (fever, an elevated WBC count of 14,000 with a left shift, and drainage of the wound) I believe that Dr. Ellison initially might have felt differently about the role of infection, and gone after it more aggressively*" (emphasis added). Plainly, then, the failure of Otisville to send Williams' medical records to Horton was a major blow to what little chance remained of saving Williams' leg by receiving appropriate antibiotic treatment at Horton.

as having an E. Coli infection, as reported by Roche Laboratories, and had been transferred to Horton for intravenous administration of antibiotics. Dr. Ellison, mistakenly, assumed that whatever infection existed, if any, in Williams' right foot was purely superficial and merely a sequela of the development of necrotic tissue resulting solely from loss of circulation (or ischemia) in the tissues.[22] Furthermore, considering Dr. Ellison's premise of a circulatory occlusive process as the sole cause of the rapidly progressing gangrenous condition in Williams' foot, the incidental presence or absence of an infectious agent and its genesis (ischemia or something else) were not, in Dr. Ellison's mind, critical to the appropriate treatment of Williams' condition (Tr. 319). Consequently, since Dr. Ellison erroneously perceived Williams' critical limb-threatening problem to be essentially ischemic,[23] high-dose intravenous antibiotic therapy with Gentamicin, Tobramycin or Carbenicillin was never instituted at Horton, contrary to Dr. Rossi's purpose for transferring Williams to Horton. Totally unaware that Williams was sent to Horton with an E. Coli infection for treatment with high-dose intravenous antibiotics (which was crucial to even the very slight chance remaining for halting the progression of

infection and heading off gangrene), and based upon his faulty clinical impression that Williams' difficulty was primarily ischemic, Dr. Ellison prescribed as simply a prophylactic measure against supervening infection (Tr. 321) an *oral* antibiotic (Ampicillin), which according to Dr. Boxhill in his letter of August 4, 1989, "would actually have been *less effective* against the infecting E. Coli than the Geocillin which Mr. Williams had received already at Otisville" (emphasis added).

September 24, 1985

When Dr. Ellison debrided Williams' right foot, lacking the Otisville medical records, he erroneously believed that there was no infection (except possibly for a supervening, on-the-surface process and normal sequela to necrosis), but that the underlying necrotic tissue in the fourth and fifth web spaces had developed due to an occlusive process in the blood vessels resulting in loss of circulation to the skin, the fat tissues and muscles beneath. Dr. Ellison testified that the great majority of amputations of the leg and toes of diabetics is due simply to loss of circulation resulting in gangrene, and based solely on his clinical examination, that was his belief concerning Williams' problem (Tr. 312, 326, 328).

**22.** "Ischemia" is defined by *Taber's Cyclopedic Dictionary* (10th ed.1968) as "local and temporary anemia due to obstruction of circulation to a part."

**23.** Dr. Boxhill's report of August 4, 1989 points out:

"Dr. Ellison's diagnosis, based on his inspection and examination of Mr. Williams, lacked the benefit of important clinical information generated from Otisville F.C.I., including the positive wound culture and the nature and pattern of antibiotic resistance of the infecting E. Coli organism. Dr. Ellison was aware that Mr. Williams had been receiving antibiotics by mouth prior to his transfer. It is possible that the antecedent treatment with antibiotics (Keflex and later Geocillin) may have altered outward manifestations of infection sufficiently to obscure the true diagnosis."

\* \* \* \* \* \*

"The perception of an ischemic rather than primarily infectious process by Dr. Ellison in Williams' right foot resulted in prescribing Ampicillin by mouth (which would actually have been less effective against the infecting E. Coli

than the Geocillin which Mr. Williams had received already at Otisville F.C.I.). This choice was logical based on Dr. Ellison's perception that antibiotics were an accessory and prophylactic treatment, rather than crucial to halting the progression of infection and allowing demarcation of gangrene to avoid the necessity of below the knee amputation. Although, I believe that high dose intravenous antibiotics would have been preferable, Mr. Williams had no vascular access, and performing a cutdown to enable intravenous access for medications was not high on Dr. Ellison's priorities based on his clinical impression."

"With the benefit of hindsight, one wonders whether intravenous treatment with high dose bactericidal antibiotics (as originally proposed by Dr. Rossi) [but uncommunicated to Dr. Ellison] through a cutdown or central IV would have healed the foot and saved the need for amputation. That benefit was denied Dr. Ellison who did not have the information contained in pathology reports and vascular diagnostic studies (acquired only after surgery), [or the records from Otisville that were available before surgery] and who was forced to act boldly in the face of advancing gangrene."

A report from Horton Hospital on a radiologic image consultation regarding the abscess in Williams' right foot, dated September 24, 1985 (Joint Exhs. 2 and 3, G 306), demonstrated the presence of gas in the soft tissues related to the fifth ray. "Impression: Soft tissue gas compatible with clinically evident abscess." The presence of gas indicated bacteria were proliferating and releasing carbon dioxide or other gases into the skin and was consistent with the presence of infection (Tr. 455, 577–88).

September 25, 1985

Dr. Ellison first found a strip of gangrenous tissue in Williams' right foot (Tr. 337)[24] Once he saw the development of gangrene in Williams' foot, it is understandable that its treatment would have commanded Dr. Ellison's first attention, and that treating an infection would have been considered as incidental. The gangrene apparently occurred over a period of just 24 hours (Tr. 511), and the process taking place in Williams' foot was "rapidly progressing" and involved an increasing segment of his foot (Tr. 337–38).

September 26, 1985

Dr. Ellison again examined Williams' foot, found no improvement and discussed treatment with him.

September 27, 1985

Dr. Ellison noted no improvement in Williams' condition and, on the contrary, Williams' right fifth toe had now become gangrenous. Dr. Ellison obtained Williams' consent to an amputation of his right fifth toe in an effort to save his foot and leg. According to Dr. Ellison, once gangrene starts in the foot, the ability to salvage a foot becomes very questionable.

September 28, 1985

By now Williams had a very deep infection all the way along the right foot, which had initially been unroofed by Dr. Ellison on Sept. 28th. Dr. Ellison debrided the gangrenous skin and soft tissues of Williams' right foot and amputated his nonviable right fifth toe hoping that such amputation would arrest the spread of the gangrene (Tr. 337–38). Dr. Ellison's post-operative report on the toe amputation noted a swollen, blistered, infected right foot and found a necrosis of the entire fifth toe into the web space. The necrotic tissue in Williams' foot went deep—it extended well into the soft tissue with necrosis of the underlying muscle down to the bone (Amended Pretrial Order, Agreed Statement of Facts, par. 29).

September 30, 1985

By this date, the infection was extensive and profound and went up the ankle. Unable to arrest the deeply situated and rapidly advancing gangrene in Williams' foot and leg and not believing that any specific medical treatment or more limited surgical procedure could arrest the condition, Dr. Ellison suggested and Williams consented to a below-the-knee amputation of his right leg, which was performed that day (Tr. 326, Joint Exh. 3, G285).[25]

Dr. Ellison's post-operative report of September 30, 1985 states: "The patient presented with a progressive infection and gangrene of his right foot two days previously. This had been opened and drained and the process obviously extended into the depth of the foot, involving tendons and muscles" (Amended Pretrial Order, Agreed Statement of Facts, par. 32; Joint Exhs. 2 & 3, G285).

October 1, 1985

A pathology report from Horton Hospital of this date by Dr. S. Louie (Joint Exh. 3, G 286) shows the condition of Williams' right leg which was removed by the amputation. Regarding the gross amputated limb, the report states, in pertinent part: "There is an ulceration that originates at the site of

---

**24.** Gangrene is a process in which the tissues are necrosed, *i.e.*, the tissues die as a result of a lack of proper blood supply (and hence oxygen) and often become discolored and blackened as a result of the death of the tissue. Needless to say, it must be a *horrifying experience* to a patient to see such condition in a foot or leg and be informed by a physician that it is gangrene, therefore irreversible and can spread rapidly if the necrotic tissue is not promptly removed (amputated).

**25.** A below-the-knee amputation is done to provide better balance for the patient and fit of the prosthesis (Tr. 326).

the right fifth digit and extends along the plantar surface toward the posterior foot and up to the medial aspect toward the medial malleolus. * * * There is suppurative purulent material (indicates the presence of infection (Tr. 453)) in the distal aspect of the ulcer. In one area the underlying muscle is exposed. The combination of arterial vascular supply of the leg, which includes the anterior tibia, posterior tibia, perineal and dorsalis pedis vessel reveals focal, *mild atheromatous change. No gross thrombi are identified"* (emphasis added).

The pathologist's microscopic examination of specimen tissues discloses: "Sections of the ulceration show gangrenous changes with suppuration and focal myofibrillar atrophy. There are seen small *arterioles that are occluded with early organizing thrombi.* The *larger vessels show minimal atherosclerosis"* (emphasis added) (Tr. 316). The pathologist's microscopic diagnosis states: "Right leg, amputated below the knee, with ulcer, suppuration and necrosis (gangrene). Small occluded arterioles containing *early organizing thrombi.* Larger vessels with *minimal atherosclerosis."* (Joint Exh. 2 & 3, G 001052, emphasis added).

The foregoing pathologist's report (which, of course, Dr. Ellison did not have prior to surgery) of larger vessels with "minimal atherosclerosis" and occlusion of the arterioles by *"early organizing thrombi"* (a relatively recent development) substantially refutes Dr. Ellison's presurgical diagnosis, as we have seen, was that the occlusion in Williams' arterioles in his right leg was due to a diabetic ischemic process, with an infection, if any, as simply an incidental, superficial supervening (or secondary) occurrence to the development of necrosis caused by the occlusive process.

Dr. Lord stressed that the pathologist's report is remarkable in the detailed examination of the tibial and peroneal arteries: All three arteries showed minimal atherosclerosis and were without gross thrombi. The microscopic examination showed *only organizing thrombi* in the arterioles (tiny arteries) of the foot (*see* Dr. Lord's report

of July 6, 1985, Joint Exhs. 4, 5, 6, and deft's exh. 1).

Dr. Ellison testified that when he first examined Williams, he saw no obvious signs of infection (inflammation is not necessarily indicative of an infection). Unfortunately, and it simply must be reiterated, Otisville *inexplicably failed* to send Horton Hospital Williams' medical history or even a transfer report. Astonishingly, Dr. Ellison testified that in treating patients from Otisville, he frequently failed to receive the patient's medical history, and consequently, Dr. Ellison, relied upon whatever medical history he could glean from his patients (Tr. 334–35). Dr. Ellison explained that it was quite uncommon for him to receive a full transcript of the medical history from a federal institution, but at best, a one or two sentence description of the patient's problem would be sent to him. In the case of Williams, Dr. Ellison received no report whatever from Otisville.

The court is quite shocked at the cavalier and shoddy manner in which the medical staff at Otisville transferred Williams, whose right leg was in a very precarious condition, to the Horton hospital without accompanying copies of the medical records or any summary thereof. Even Dr. Boxhill, who readily accepted as appropriate all of the other phases of Williams' care and treatment at Otisville, did not attempt to defend Otisville's inept handling of Williams' transfer to Horton.

In view of the circumstances surrounding Williams' transfer from Otisville to Horton Hospital without even as much as a one page summary or note of his medical history at Otisville by Dr. Rossi, the Horton pathologist's report, and the expert testimony and reports of both plaintiff's and defendant's expert witnesses, the court attaches no credibility whatever to Dr. Ellison's premise in treating Williams that the infection was simply a sequela and supervening superficial occurrence to the development of necrotic tissue and gangrene resulting from a circulatory occlusive process incident to Williams' diabetic condition.

October 9, 1985 and thereafter

On this date, Williams was discharged from Horton Hospital and transferred by the Bureau of Prisons to Springfield, Missouri Medical Center (Tr. 373, Joint Exh. 3, G308). Plaintiff underwent periods of pain and inability to ambulate during his rehabilitation when he was fitted with an artificial leg and learned to walk with the prosthesis and a cane.

After Williams' right leg was amputated, he was fitted with a cast. The cast had to be changed periodically because his right thigh was shrinking. Eventually, the cast was removed and from a cast of the shrunken thigh, a prothesis was fitted.

Williams experienced the usual "stump discomfort" (soreness and irritation over the bone end of the stump to which the prosthesis is attached) while he was learning to walk. Williams also suffered from "phantom limb" pains, *viz.*, pains at the nerve endings of the severed limb which give the sensation that the limb is still attached. The amputee senses his severed foot due to the stimulation of the unhealed severed nerve endings; the patient interprets sensations received through the nerve fibers as coming from the foot or toes even though the extremity has been amputated. Williams also suffered from "sharp pains that would grab at you occasionally" and a "constant throbbing" (Tr. 69) in his right thigh, which he associated with wet weather. At Springfield, Williams received physical therapy to rebuild the deteriorated muscles and strength in his right thigh.

Williams testified that his leg shrinks and expands and consequently rubs within the prosthesis causing blisters which feel like sand or pebbles in a shoe. When this blister problem occurs, (on an average of once a month), Williams must take the prosthesis off and try to walk with a cane or crutches until his stump heals. Williams still suffers from occasional sharp pains in his right thigh.

Ultimately, and happily, the stump healed well and an excellent surgical result was obtained from amputation of the right lower extremity. At the trial, Williams appeared to the court to be ambulating satisfactorily, even without a cane; and the court was impressed by the ease and proficiency with which Williams adeptly removed and reattached the prosthesis when he was examined by the parties' expert witnesses. Williams must still use a cane or crutch occasionally, especially if he walks more than four or five city blocks.

In January 1986, Williams completed his rehabilitation at Springfield Medical Center and his subsequent personal history is discussed above.

## III.

### Otisville's substandard medical care of Williams' foot infection.

As indicated above, at Otisville there were serious departures by the medical staff from the most fundamental standards of accepted medical practice pertaining to the diagnosis and treatment of an infected diabetic foot. Beginning with Sept. 6, 1985, erroneous diagnoses and improper treatment concerning Williams' right foot infection by Dr. Rossi and his assistants led to an advanced infection and necrosis of tissues that ultimately culminated in gangrene requiring amputation of Williams' right leg at Horton Hospital on September 30, 1990.

The court has little doubt, and the parties do not seriously dispute, that in Williams' case, the E. Coli infection in his right foot was an important factor leading to the development of gangrene and the consequential below-the-knee amputation. As to the following pertinent questions raised by the parties, there is little agreement:

1) When did the E. Coli infection first arise and become reasonably evident in Williams' foot?

2) How did the infection arise and what was its route of entry to the right foot and leg?

3) Did Otisville employ acceptable diagnostic methodology in the evaluation of Williams' foot pain and related symptoms considering that he was known by Otisville to be diabetic?

4) If the answer to question 3 is affirmative, was Williams' E. Coli infection recognized and diagnosed as expeditiously as possible under the circumstances?

4) Did the Otisville medical staff provide Williams with medical care and treatment in conformance with acceptable standards applicable to the diagnosis and treatment of infections in the diabetic foot?

5) What were the roles or extent of contribution, if any, of predisposing diabetic microangiopathy and/or neuropathy [26] as accessories to the infectious process and eventually in the development of gangrene?

6) What was the role or extent of contribution, if any, of Williams' use of cigarettes, drugs and alcohol in predisposing him to the infectious process and gangrene or in exacerbating his condition or impairing his treatment?

7) What was the causitive relationship, if any, of the improperly sized institutional shoes Otisville furnished to Williams to the E. Coli infection?

Each of the foregoing questions in turn have a multitude of subissues which have been raised by the parties and considered by the court.

After careful review of the trial testimony, documentary evidence, and depositions admitted in evidence, and determining the weight and credibility to be accorded to the evidence, the court finds that plaintiff has sustained his burden of proof by a preponderance of the evidence.

The etiology of the gangrene that developed in Williams' right foot was essentially the E. Coli infection and its microvascular sequela causing occlusion of arterioles, necrosis and gangrene, as discussed below. The short of the matter is: the effective proximate cause of the gangrene and consequential below-the-knee amputation of Williams' right leg was the failure by the Otisville medical staff to provide plaintiff with medical care, treatment and diagnosis in accordance with the most basic acceptable standards applicable to an infected diabetic foot.

Dr. Lord meticulously traced the genesis of Williams' deficient medical care from September 6, 1985 and the chain of inept diagnoses and treatments of Williams' condition by the medical staff at Otisville that finally culminated in the amputation of his right leg. Dr. Lord's testimony points up that medical care for foot pain and possible infection that would meet acceptable standards for a patient in good health, may be grossly deficient where the patient is a known diabetic with possible concomitant vascular and nerve complications of diabetes affecting his legs and feet, particularly when these conditions may be exacerbated by smoking.

As above, where Williams' pertinent medical history at Otisville was outlined chronologically, the deficiencies in his medical care will be similarly discussed.

September 6, 1985

On September 6, 1985 Williams complained for the first time to PA Garcia of pain in only his right foot. Garcia found tenderness in the plantar surface of the right foot at the base of the third toe, but did not suspect and therefore did not look for the presence of infection.

Dr. Lord testified, and the court finds, that Garcia failed to act in accordance with the accepted standards of medical practice in the community at that time. Specifically, Dr. Lord characterized Garcia's examination of Williams' foot and his recommended treatment as "very deficient" (Tr. 210). According to Dr. Lord, Garcia should have suspected an infection and examined the plantar surface of Williams' right foot for a break or laceration of the skin through which bacteria could enter, especially between the toes and web spaces. Such a thorough probing examination was indicated since Williams was a known diabetic and had a history of fungal infection (*see* entry for June 6, 1985) (Joint Exh. 1A, G001060), "which is the commonest cause of infections that [he] had seen over the 40–odd years of practice, [and] source of

---

**26.** In the record of this case, the terms "polyneuritis," "peripheral neuritis," "diabetic neuropathy," were all used synonymously to refer to the same neurological disorder.

the introduction of pathogenic bacteria" (Tr. 211).[27] The accepted standard of practice in 1985 in the case of a diabetic with a painful foot required a careful examination of the foot, *including the web spaces*, under good light (Tr. 821). Garcia failed to make such an examination.

Dr. Lord further testified that if Garcia had made a careful and appropriate examination, he would have found a fissure between the fourth and fifth toes, where ultimately pus appeared eleven days later. If a fissure had been found, the next proper step would have been to make a diagnosis of early cellulitis (diffuse subcutaneous infection without pus). Since Williams was diabetic, the proper treatment should then have been all-encompassing including: (1) strict bed rest from and after September 6, 1985, and avoidance of walking, which puts pressure on an infected foot and massages the infection into the surrounding tissues thus spreading the area of infection (Tr. 794)[28]; (2) a culture of the fissure to identify the infectious organism and the specific antibiotics to which it is sensitive; (3) warm compresses to draw the infection out to eliminate the cellulitis or lymphocytis; and (4) administration of broad spectrum oral antibiotic treatment until the culture report was received identifying the specific infecting organism and the antibiotics to which it is sensitive (Tr. 212–13).[29]

Dr. Lord testified that if the foregoing appropriate examination and care had been given to Williams on September 6, 1985 (or within a few days thereafter), the amputation of his leg would almost certainly not have been necessary—*the chances were better than 95 out of 100 that Williams' leg could have been saved with proper care at that early stage* (Tr. 213, 221).

On cross-examination of Dr. Boxhill, counsel for Williams read into the record portions of *Management of Diabetic Foot Problems*, Joslin Clinic and New England Deaconess Hospital (1984). Dr. Boxhill was familiar with the Joslin Clinic in Boston, which treats solely diabetics, and of the six contributing authors, he was familiar with three of them and "would give great credence to anything they stated" (Tr. 655). The foregoing circumstances are sufficient to regard the text as authoritative for the treatment of diabetic foot problems, including the basic procedures in treating diabetic foot infection. On the basis of the portion of the text read into the record by plaintiff's counsel, it is clear that the accepted standard of medical care for treating a diabetic foot lesion, as Dr. Lord testified, mirrors precisely the "textbook approach." The court accepts Dr. Lord's testimony (which was subjected to rigorous cross-examination) as independently credible, and buttressed by the textbook.

The record is clear that Otisville failed to observe basic standards for managing a diabetic foot problem, particularly the procedures for treating the infected diabetic foot, and as explained below, ineptly conducted those procedures that it administered.

In Chapter 1, p. 5, covering "Diabetic Foot Disease: A Major Problem," with obvious reference to foot infections, the text states:

Bed rest is the key to managing diabetics with foot disease. No matter how much effort is put into treating the *local lesions* by giving antibiotics and regulating diabetes, *the foot with the lesion must be put to rest if it is to heal.*

---

**27.** In 1985, it was well recognized that athlete's foot was one of the most common predisposing conditions for a bacterial infection. This is because the progression of the fungal infection leads to a portal of entry (*i.e.*, a break in the skin) for pyogenic bacteria (Tr. 570–71).

**28.** Defendant's expert, Dr. Boxhill, conceded that walking on an infected foot is traumatic to the foot of a diabetic. According to Dr. Boxhill, "[i]t would be a big mistake to walk on an infected foot" (Tr. 617–18).

**29.** Dr. Lord testified that an infected leg in diabetics having partially impaired circulation (not end stage ischemia) can be saved "in the vast majority of circumstances" with incision and drainage if pus has formed. Dr. Lord did not believe there was pus present in Williams' foot on September 6th, but such pus developed a few days later (Tr. 214).

Crutch walking or walking 'on the heel' is in most cases, no alternative. Bearing weight on an ulcer or a healing incision breaks down the fibroblast network or barriers and slows healing by squeezing bacteria into the surrounding healthy tissues. *Every step is a moment of ischemia to the damage area. Therefore, bed rest is the first order of treatment.* [Emphasis added.]

At chapter 12, p. 119, discussing, "Local Treatment of the Diabetic Foot," the authors state: *"Bed rest is the first item in the care of a diabetic foot lesion. It must be absolute and continuous"* (emphasis added). Dr. Boxhill agreed that bed rest is "important," that Williams should have been advised to stay off his feet as much as possible and that Williams' walking should have been "restricted" (Tr. 657–59).

At chapter 12, p. 114, under the subheading "Treating the Infected Diabetic Foot," the text states: "The basic rules in treating any foot infection are: 1. Absolute bed rest; 2. Regulation of diabetes; 3. Adequate culturing of wounds; 4. Administration of appropriate antibiotics; 5. Adequate drainage of all infection." Since the text at this point addresses explicitly foot *infections* rather than foot *disease* generally, Dr. Boxhill agreed with the foregoing.[30]

Continuing, the text states, and Dr. Boxhill agreed: "Only by careful examination of *all* parts of both feet and legs can any foot disease be appraised fully. A foot problem may be a blister, a moist *fungal infection between the toes*, a callous with an underlying abscess, a painful fissure on the heel, or frankly gangrenous toe. *Once discovered, an infected site must be opened to provide drainage of the pus and get a good culture of any purulent secretion.* Without proper drainage of abscesses or infected space, all other adjunct care may be to no avail" (Tr. 658–59, emphasis added).

In Chapter 6, p. 1, covering "Diabetic Foot Disease, A Major Problem," the text

states, but Dr. Boxhill disagreed (Tr. 659–60): "Foot soaks should never be done. Soaking macerates and spreads infection. The heat of the water may burn and literally cook the vulnerable ischemic foot or be too hot for the insensitive neuropathic foot. Foot soaks lead to more complications in diabetics than any other form of treatment. Foot soaks contribute to the development of gangrene, with ultimate amputation more than any other home remedy. Each should be washed with tepid water and gentle hand soak, but washing feet is not soaking them."

September 9, 1985

The care received from PA Gessleman on Sept. 9, 1985 when, Williams was provided with a cane and unassigned, was according to Dr. Lord, "far below the quality of care that [Williams] should have received" (Tr. 218–19). Williams' pain was persisting and getting worse, but no nerve function testing was done to rule out diabetic neuritis and no examination of the web spaces was made nor was his temperature recorded to ascertain the possibility of infection (Tr. 219).

Dr. Lord stressed that these departures from very basic acceptable medical standards were significant since early care of an infection, particularly in a diabetic, is more satisfactory and successful than when an infection becomes far advanced. According to Dr. Lord, Williams should have been seen on September 9th by Dr. Rossi, and a general surgeon with experience in treating diabetic feet also should have been called in for consultation at the institution. Alternatively, Williams should have been taken to Horton Hospital to be seen by Dr. Ellison: "In those circumstances, a competent surgeon would have recognized this patient is in trouble and he should have prompt care" (Tr. 220). Williams should have been hospitalized with strict bed rest with slight elevation of his leg, treated with warm compresses and an antibiotic (either orally or intravenously

---

**30.** Dr. Boxhill does not recommend continuous bed rest for patients with merely diabetic microangiopathy or neuropathy. Regarding Williams' infection, Dr. Boxhill would have ad-

vised him to stay off his feet as much as possible, but would not have provided him with a wheelchair (Tr. 657).

depending on what the culture of the fissure or infection showed); or if there was a suggestion of an abscess by localized tenderness over the plantar aspect proximal to the site of the infection, there should have been incision and drainage of the pus before it extended up the plantar aspect of the ankle. (Tr. *Id.*). Dr. Lord observed that as in the case of September 6, 1985, *there was a 95 out of 100 chance that Williams' leg could have been saved if he had received proper care commencing on Sept. 9, 1985* (Tr. 221).

September 12, 1985

The care rendered by PA Rochacewicz on Sept. 12, 1985 was in Dr. Lord's opinion, "far below" acceptable medical treatment in 1985 in the area (Tr. 222). Williams should have been afforded an examination by a surgical consultant with expertise in infections of the diabetic foot, hospitalization with strict bed rest and foot elevated, and culturing the infection and administration of the appropriate antibiotic (oral or intravenous) (Tr. 223–24). Indeed, from his review of Williams' medical records, Dr. Lord could not ascertain whether Williams was even instructed to stay off his feet, but such instruction "would have been wise" as "just a preliminary, number one, thing to do" since "walking on an infected foot is the worst thing you can do * * * because it massages the infection around" (Tr. 224–25).

Apparently oblivious to the possibility that Williams' right foot was infected, or the appropriate care of such foot, Dr. Rossi refused Williams' request to authorize meals in Williams' unit so he could avoid walking to the dining hall. Hence, not only was Williams not directed to stay off his feet, but he was forced to walk to obtain his meals and medication, thereby further aggravating the brewing infectious process.

September 15, 1985

On September 15, 1985, as noted above, PA Garcia examined Williams in his cell, and observing pain and tenderness in the plantar surface of Williams' right foot and that Williams was walking with difficulty even with a cane, Garcia simply prescribed Motrin for pain. Such treatment afforded by Garcia on September 15, 1985 was characterized by Dr. Lord as "grossly below" the level of care that a good PA should have rendered to Williams.

From the tenderness in Williams' right foot extending from the fifth toe up to the internal malleolus, Garcia should have recognized there was an advanced and deep infection in the plantar facia of Williams' right foot, with pus (which subsequently ruptured on September 17th in the web space at the base of the fifth toe) and Williams should not have been treated merely with Motrin (Tr. 230).

According to Dr. Lord, Garcia should have called for an emergency outside consultation through Dr. Rossi, and the latter should have seen Williams that day and immediately sent him to Horton Hospital for a wide open drainage. Dr. Lord testified that by this stage of the infection, Williams' leg could still have been saved, but his chances had sharply declined to 50 to 65 percent (Tr. 231).

The notation in Williams' chart, "No other pathology seen," was according to Dr. Lord, the result of an incomplete examination, because Williams obviously had a fungal infection between the 4th and 5th toes which had existed before September 6, 1985, and the fungal infection was the portal of entry of the E. Coli infection.

September 16, 1985

As previously noted, Williams complained of pain and tenderness in the sole and arch areas of his right foot, extending from the plantar surface of his right foot to the medial ankle area and had to walk with the assistance of a cane. Dr. Rossi, on the basis of at best a casual observation, and without doing any neurological testing (by pin prick, light touch with cotton, vibratory sense or testing for tendon reflexes) informed Williams that his pain was probably due to polyneuritis caused by his diabetes.

An evaluation by Dr. Rossi as to whether Williams was exaggerating his symptoms was deferred until Williams could be examined by Dr. Brooks, a specialist in internal

medicine and oncology (cancer). Unfortunately, Dr. Brooks came to Otisville only irregularly and infrequently (Tr. 577–78). Dr. Rossi specifically noted on Williams' chart that he questioned whether Williams was feigning pain. When Dr. Rossi was asked at his deposition of April 11, 1989, p. 98, why he had requested a consultation with Dr. Brooks, Dr. Rossi responded that it was primarily to gather some reassurance for Williams regarding his pain problem "and to confirm my feelings that *he was presenting exaggerated symptomatology*" (Tr. 232, emphasis added). Again, there is no explanation why Dr. Rossi requested a consultation with a cancer specialist. Apparently, Dr. Rossi's interest in a consultation with Dr. Brooks was simply *to confirm his suspicion that Williams' was a malingerer* and his complaints were exaggerated, and for such purpose Dr. Brooks sufficed.

Dr. Rossi again denied Williams' request for crutches, but Williams was "medically unassigned" through September 27, 1985. The term "medically unassigned" means that the inmate is not required to report for his work assignment, but does not mean that the inmate is given complete, continuous bed rest (Tr. 748). On the contrary, "medically unassigned" means that Williams had the freedom of the entire compound (Tr. 752).

Dr. Lord described Dr. Rossi's treatment on September 16, 1985 as "a tragic departure from good medical care * * * not only in the psychological aspects of his impugning the patient to be a mental case,[31] but more importantly than that, by this time the infection had extended up through the arch towards the internal malleolus" (Tr. 235). "At that point in time apparently, according to the record, he did not examine the feet at all, so I think it is really an *incredible incompetence*" (Tr. 235, emphasis added).

In Dr. Lord's opinion, on September 16, 1985 there was an abscess on Williams'

foot because he had considerable tenderness and pain aggravated by walking. That symptomotology indicated to Dr. Lord the presence of infection, usually with pus; such pus is usually deep to the plantar facia when there is pain and tenderness aggravated by walking. Necrosis and gangrene in the fifth toe and the tissues that Dr. Ellison laid open on September 28, 1985 showed necrotic margins of the abscessed cavity, corroborating Dr. Lord's opinion.

Dr. Lord testified that Dr. Rossi should have checked both feet neurologically with pin prick and light touch and examined the web space and tenderness behind the fifth toe and the fourth toe back up to the proximal arch. Dr. Lord posited that with prompt admission to Horton Hospital on September 16, 1985, with wide open drainage, appropriate antibiotic therapy and bed rest and hydration, there would have been a 50–50 chance of saving Williams' leg (Tr. 236).

September 17, 1985

In Dr. Lord's opinion, and the court finds, Williams had a preexisting epidermatophytosis (fungal infection of the skin) and such condition caused a break in the skin of the web space providing the portal of entry for the E. Coli infection (Tr. 779–80).

Dr. Lord stressed that "athlete's foot" (a fungal infection) is the commonest cause of the development of a portal of entry for a bacterial infection in the diabetic foot other than overt injury (Tr. 570–71, 792). Dr. Boxhill testified that there are many references in Williams' record (Joint Exhs. 1A, B, and C) to fungal infection, and on many occasions Williams was treated with an antifungal cream. As mentioned above, Williams was treated on June 6, 1985 for a dermatophytosis (fungal infection of the skin) relating to a tinea infection of the feet and was treated with Desitin (an antifungal medication) (Tr. 458). On June 18, 1985 the Desitin prescription was refilled (Tr. 458–459). The last entry in Williams' medical

---

**31.** In his deposition, Rossi habitually referred to Williams as an "offender," rather than as a "patient," which considering the connotation of the description, was extremely unprofessional and inappropriate for a medical practitioner and inferentially reflects the negative attitude of Dr. Rossi towards any representations of pain or other symptomology that could be a basis for a medical unassignment.

chart at Otisville showing treatment for fungal infection was June 18, 1985 (Tr. 459), but there is no subsequent entry indicating that the condition was ever cured.

In Dr. Lord's opinion, although Williams' chart does not note a fungal infection after June 18, 1985, a preexisting fungal infection in Williams' right foot continued in the period of September 6 through September 30, 1985 since there is no indication in Williams' records that the fungal infection was ever completely cured.[32]

Dr. Lord believed that the point of entry of the E. Coli infection was in the web space between the 4th and 5th toes of the right foot. Although no drainage was evident prior to September 17, 1985, a culture could have been taken if the medical staff had examined the web spaces and found a fissure (Tr. 760–61). In Dr. Lord's opinion, the medical staff failed to see any breaks or fissures in the web spaces of Williams' right foot simply because there were no examinations by the PAs or by Dr. Rossi of the web spaces (Tr. 808–09).

Plaintiff's counsel read to Dr. Lord, on redirect examination, from *Vascular Surgery, Principles and Techniques* (McGraw Hill, 1976), p. 906, an authoritative text (Tr. 765), by Dr. Henry Haimovici (one of the nation's leading authorities on vascular surgery (Tr. 764–65)):

> It is a well-established fact that diabetics are very vulnerable to infection. Any breaks in the continuity of the skin may act as a portal of entry for the growth of bacteria in diabetes. Pyogenic [pus producing] organisms are often associated with mycotic [fungal] infection, especially with epidermophytosis [athlete's foot]. It should be emphasized that foot sepsis [infection] usually starts as a mycotic infection, leading to the development of maceration. This may result in interdigital [between the toes] fissures or

ulcerations and may become secondarily infected with bacteria. As a result of circulatory impairment, infection in diabetic patients is likely to lead to lymphangitis, cellulitis, deep tissue abscess, osteomyelitis and ultimately, gangrene. *The loss of tissue can often be traced to an initial infection in subungual [under the nail] or interdigital ulcers,* fissures of the heel, traumatic lesions of the foot or ill-advised surgery for ingrown toenails or calluses and corns. Superficial lymphangitis and cellulitis not responding promptly to systemic antibiotics most often mask the underlying abscesses either of the subcutaneous tissue or of the subfacial layer. As a result, the infection and necrosis are more extensive than the appearance of the skin would allow one to suspect. *It is, therefore, essential not to procrastinate with the use of antibiotics and to proceed promptly with an incision and drainage of these lesions.* Subfacial abscesses of the deep plantar surface are often more difficult to diagnose because of the presence of edema and absence of fluctuation. A mixture of pus and necrotic tissue is confined in the subfacial space with no spontaneous drainage. In most cases one finds an associated gangrenous toe, an infected callous or bunion or an *infection in the web space between the toes,* all of which account for the invasive sepsis of the flexor tendon sheath leading to the plantar space.

(Tr. 765–68, emphasis added.)

Dr. Lord completely agreed with the above text and testified on redirect examination (Tr. 768):

"Q These excerpts which I have read, do they bear any relationship to what, in your opinion, was the—I think what you doctors have called a pathogenesis of this

---

**32.** It may be true that if a fungus is present on the skin when a pathological specimen is examined, the pathologist should be able to see the spores in the skin (Tr. 571). Since the Horton pathologist did a microscopic examination of the ulceration in Williams' amputated limb, he would have seen the spores, if present. The pathologist's report makes no reference to the presence of fungal spores (Tr. 569). However, this fact is given little weight since there is no evidence that the pathologist was requested to look for and report on fungal spores; and the gangrenous changes and suppuration could have obscured the presence of fungal spores when pus erupted on September 17, 1985 (Tr. 813).

infection and the whole process that led to the amputation below the knee?

A Precisely Mr. David Williams' problem."

The court agrees with Dr. Lord that the foregoing discussion describes essentially the genesis of Williams' bacterial infection, and the process that led to necrosis, gangrene and amputation.

By this date, even without a laboratory confirmation, it should have been obvious to the Otisville medical staff that Williams, because of his diabetes (and possible vascular disease) and his increasingly painful and tender right foot, was in potentially very serious difficulty if his foot were infected. The Otisville medical staff knew for more than ten crucial days that Williams had been suffering from and reporting a progressively more painful and inflamed foot and that he could no longer walk except with the aid of a cane or crutches. Now "the handwriting was clearly on the wall": *an infectious discharge and drainage (not definitively described on the chart, but described as "pus" by PA Coleman in his deposition, Tr. 395, 755) had erupted from a small fistula below the right fifth toe and web space.*

Dr. Boxhill testified that at the time the fistula first appeared, it was very tiny and "inconsequential looking" (Tr. 488). However, Dr. Lord noted that the point at which the pus was draining (*i.e.*, the fistula) was not necessarily the site of entry or the fissure in the web space through which the bacteria entered and caused the infection (Tr. 757). Consequently, Dr. Boxhill's comment that the fistula itself was not consistent with a fungal infection (Tr. 488) is irrelevant. According to Dr. Lord, the point of rupture will be the lowest resistant area where the pus is backed up and under great pressure and it could be at the site of entry *or could be nearby* (Tr. 757–58).

The draining fistula (the size of the point of a ballpoint pen) indicated that the deep seated infection in the plantar part of the foot came under such great pressure from the liquid purulent material that it ruptured through a small opening to the outside, and that is the reason the discharge was noted (Tr. 747). There is no evidence that the oversized institutional shoes furnished to Williams when he entered Otisville in February 1985 caused the opening through which the bacterial infection entered or the fistula through which the pus was draining.[33]

If the Otisville medical staff viewed Williams' symptoms prior to September 17, 1985 as inconsequential, it is apparent by the action taken on that date the staff was by then seriously concerned by the appearance of an infectious discharge coupled with Williams' other limb-threatening symptoms: a culture of the pus was taken from the draining fistula and sent to Roche Laboratories for a report; Williams was put on broad spectrum oral antibiotic (Keflex) treatment; his blood was drawn for a white blood cell count (later found to be abnormally elevated at 16,100); his temperature was taken and recorded (a slightly elevated 99 degrees); thrombophlebitis was ruled out; Williams was instructed to take daily whirlpool baths for his right leg and elevate it at night; Darvocet was given for pain; Williams' right foot was X-rayed to rule out any bone abnormality or osteomyelitis or infection of the bone (the X-ray was normal) (Tr. 376–77); and Williams was referred to Dr. Rossi for prompt evaluation.

Regarding Williams' medical treatment on September 17, 1985, Dr. Lord testified: "In the little things they [Otisville medical staff members] did a proper program * * *. *But the very bad departure from good medical practice was in not hospitalizing him immediately with the overt and obvious infection now, with pus com-*

---

**33.** Dr. Boxhill disagreed with Dr. Lord that the oversized shoes furnished Williams was a possible cause of the ultimate loss of his leg. Boxhill testified that loosely fitted (oversized shoes) would not cause injury and infection (Tr. 528–29). While the substantially oversized institutional shoes furnished to Williams in February 1985 were obviously uncomfortable and could have caused abrasion by movement of the shoes against the feet, the court finds no evidence that they produced any injury or infection in Williams' right foot.

*ing out, tenderness all along the plantar aspect of the foot all the way up to near the ankle.*[34] *That is the main error."* (Tr. 241, emphasis added).[35]

According to Dr. Lord: A competent internist suspecting infection in a diabetic foot will consult with a general or vascular surgeon and that was the accepted standard in 1985 in the community (Tr. 266, 726).[36] Dr. Lord stressed that *once the infection in Williams' foot became overt* (as it clearly was by September 17, 1985), Williams should have been referred to a "competent surgeon like Dr. Ellison," who would have seen him on an emergency basis; Dr. Ellison presumably would have hospitalized Williams immediately (rather than wait nearly one week later), drained the whole foot, with ancillary care of antibiotic treatment, bed rest with foot elevation, and general diabetic management (Tr. 243). Dr. Lord testified that as of September 17,

1985, the chances of saving Williams' leg would have been 50–50.

Dr. Boxhill's opinion that the E. Coli infection (which he believed first occurred on September 17th) was so deep in the foot that the *only possible surgical treatment* would have been a below the knee amputation, and that a less drastic surgical procedure at no time would have cured Williams' infection, is flatly rejected as purely speculative.

In Chapter 10, p. 99, of the Joslin Clinic text, *supra,* discussing "Infection of the Diabetic Foot," under the subheading of "Principles of Antibiotic Therapy," the writer states (mirroring Dr. Lord's views): "Patients with threatened limb loss should *certainly be admitted to the hospital and treated with antibiotics intravenously* to insure adequate serum levels." (Dr. Boxhill could not "categorically" agree (Tr. 661–62, emphasis added)).

**34.** Dr. Lord explained that the typical pathway of infection from the fifth toe is deep through the plantar fascia. It goes up to the medial side of the foot, the arch, and if it extends beyond, it goes up to the internal malleolus behind it, and then it goes on up the leg. Regarding defendant's concern that plaintiff was exaggerating the penetration of the infection into the foot, Dr. Lord stated that it is quibbling whether you say "proximal arch" or "at the ankle" as they are merely millimeters from each other (Tr. 242).

**35.** Dr. Boxhill testified that Williams' problem on September 17th appeared to be "really almost inconsequential," and that referral to a hospital on that date would have been quite premature (Tr. 493). Under all of the facts and circumstances leading up to the occurrences on September 17th, the court gives no weight to that testimony, particularly in light of Dr. Boxhill's statement: It is common in diabetics to have *infections that initially appear innocuous* or trivial, but "one of the characteristics of infections in diabetics is that they spread very rapidly and become devastating very quickly, as this one, I believe did" (Tr. 493).

**36.** Dr. Boxhill testified that if *he* had been treating Williams on September 17, 1985, he would not have requested a surgical consultation at that point, but would have treated Williams in the same manner as did the medical staff at Otisville. If he views a patient's foot infection as "inconsequential," his practice is to prescribe oral antibiotics. Only if that treatment fails would Boxhill call for a surgical consultation (Tr. 486–87). Moreover, while Boxhill believes

that bed rest is appropriate in some conditions, he does not believe that bed rest is essential to managing diabetic "foot disease" in general (Tr. 651–52). Dr. Lord's reference to hospitalization and bed rest concerned the treatment of foot *infections,* and not foot disease in general.

Dr. Boxhill is a New York City specialist in diabetes and endocrine disorders who devotes approximately half his time to diabetic patients. He is exceptionally well-trained and experienced in the primary care of diabetic patients, and has undoubtedly successfully treated many patients in his office with vascular complications and foot infections (Tr. 551), and from his expertise and experience has a keen knowledge of when it is appropriate for him to refer a patient for a surgical consultation. Plainly, and understandably, Otisville did not have in-house Dr. Boxhill's specialized expertise, experience and resources for treatment of the diabetic foot. Dr. Boxhill pointed out that when one sees a specialist, one can expect to have a more thorough examination and more refined opinion (Tr. 551).

The simple fact is that Otisville did not have as much "leeway" as would have Dr. Boxhill to prudently delay referring Williams for a surgical consultation once an infection had become overt. Consequently, testimony by a medical specialist in diabetes, like Dr. Boxhill, as to the point at which he would have called for a surgical consultation has little relevance or weight in regard to whether Otisville, given its level of expertise in the treatment of diabetic foot infections, met the standards of acceptable care and treatment in Williams' case.

At Chapter 10, p. 102, under the subheading, "Conclusions," the text reads: "Limb-threatening foot infections are an emergency and *require immediate attention* in the diabetic population. Early and aggressive surgical debridement of necrotic tissues and *drainage of purulent collections are crucial* to successful outcome. *Full dose intravenous antibiotics directed at the likely pathogens must be initiated promptly.* Once definite results of cultures are obtained, therapy can be appropriately tailored to minimize the risk of adverse drug effects. It is hoped that the principles and guidelines discussed in this chapter will reduce the number of major amputations performed on diabetic patients." Dr. Boxhill agreed with the foregoing statement (Tr. 662).

Dr. Lord further pointed out that on September 17, 1985, Dr. Rossi should have requested an expedited laboratory report from Roche on the culture of Williams' infectious discharge; a report could have been available by telephone as early as September 19, 1985 rather than delayed until September 23, 1985. Dr. Lord testified that when a culture is taken, an early indication of the nature of the infectious organism may be obtained usually within 24 hours if there is rapid growth; sensitivity studies take approximately 48 hours.

Interestingly, Dr. Boxhill testified that since time is of the essence in receiving a report on a culture from an infected diabetic foot, when he takes a culture in the hospital, he delivers the specimen to the laboratory personally so that he can receive a report in the minimum requisite period of 48 to 72 hours (Tr. 490, 603, 605). Dr. Boxhill conceded that when a physician must send a specimen to an outside laboratory in the normal way, there is no way of telling how long it will take to receive a report (*Id.*). In the case of Williams, Dr. Rossi certainly should have suspected that Williams' right foot was seriously infected and should have made every effort to expedite receiving this vital report of the culture.

Dr. Boxhill, although conceding that an infectious process was apparent on Septem-

ber 17, 1985, testified he would not have been sufficiently impressed at the time with the appearance of Williams' foot to have made "strenuous efforts" to obtain an expedited report on the culture (Tr. 671–672). Such testimony strains credulity considering Dr. Boxhill's expertise in treating diabetics, Williams medical history by September 17th, and Dr. Boxhill's special knowledge concerning the critical importance of early diagnosis and prompt *and appropriate* treatment of an infected foot of a diabetic.

To briefly reiterate: Williams had been complaining to the medical staff for nearly ten days of pain, tenderness and swelling in his right foot; he had a history of chronic tinea infection of the toes, "with both nails almost gone"; he could ambulate with difficulty only with a cane or crutch; he had been medically unassigned (excused from work due to his medical condition) just the day before for a period of ten days; he had been referred by Dr. Rossi to Dr. Brooks for an evaluation of his foot condition; Dr. Boxhill believed that Williams had the usual "triad of conditions" that frequently lead to leg amputations (discussed *infra*); Williams was a smoker; and now a drainage of pus from a fistula appeared manifesting an infectious process. To use Dr. Boxhill's own characterization for Williams' situation, *plaintiff was a "sitting duck" for an amputation* (Tr. 574–75).

Further, Dr. Boxhill's comment in his report of May 2, 1985 that he "would date the onset of infection to 9/17/85" when a low grade fever and the drainage of purulent matter below the right fifth toe were first observed was aptly criticized by Dr. Lord, who pointed out: Pus is one of the *latest things* you see in an infection and takes time to build up; the early signs of infection are cellulitis, lymphangitis, local tenderness, and minimal swelling; "so when you get pus, * * * the whole house is on fire, not just the stove" (Tr. 271).

In the case of the diabetic patient with a medical history such as that presented by Williams, delay of proper diagnosis and treatment of an infected foot until such an

overt sign of infection as the drainage of pus would clearly be poor management of his condition. The further delay in accurate diagnosis and proper treatment of Williams' infection for an additional six day period, from September 17th to September 23, 1985, was completely indefensible. Consequently, from and after September 17, 1985 when a limb-threatening infectious process in Williams' foot was patently obvious, and the chances of saving his leg by appropriate care were rapidly diminishing, Otisville's departure from accepted standards of medical care, and hence negligence, was even more apparent than prior thereto. Dr. Boxhill's testimony that he, like Dr. Rossi, would not have been in any rush to receive the results of the culture taken on September 17, 1985 is simply not credible in light of Williams' medical history. Dr. Boxhill's testimony that Williams' condition on September 17, 1985, was not sufficiently dramatic looking to present a limb-threatening infection (Tr. 677–78) is given no credibility in light of his other testimony and the evidence of Williams' medical history to that date.

The court finds no credibility in Dr. Boxhill's testimony that on September 17, 1985, Williams' medical treatment at Otisville was within acceptable standards because that was the date of the onset of infection, nor in his testimony that there was no need for hospitalization or a surgical consultation by Otisville, since Williams' draining fistula appeared to be "really almost inconsequential" (Tr. 486–88, 493), and that had Williams come to his office, Dr. Boxhill would have provided the same treatment as provided by Otisville (Tr. 487–488). Dr. Boxhill readily conceded that in diabetics, infections may initially appear inocuous or trivial, but "one of the characteristics of infections in diabetics is that they spread very rapidly and become devastating very quickly, as this one, I believe did" (Tr. 493). The short of the matter is that by September 17, 1985, Williams' foot problem should have been approached by Otisville with

much more prudence and caution than is exhibited in this case.

September 19, 1985

When added to all of the other clear evidence of a serious limb-threatening infection on September 17, 1985 (severe pain, inflammation, drainage of pus) the seriousness of Williams' situation was pointed up when his white cell count on the 17th was ascertained on September 19, 1985 by PA Coleman to have been a substantially elevated 16,100 (normal count is 4,000—10,-000). Since a report of the culture had not been received from Roche, the Otisville medical staff simply maintained Williams on oral antibiotics and instructed him to soak his foot in a whirlpool bath (Tr. 652). Although the Roche report was critical to an accurate diagnosis of Williams' infection and its appropriate treatment, no effort was made to obtain a telephonic or written report on either Thursday, September 19th or Friday, September 20th.

September 21, 1985

Dr. Boxhill testified that trauma to Williams' foot on this date as a result of a fall by Williams in his cell may have provoked the gangrene in his foot (Tr. 565–67). On Williams' medical chart there is no entry for September 21, 1985 indicating that Williams fell in his cell or that Williams' foot was traumatized on that date.

There is a statement in Williams' deposition of April 4, 1989, page 163, beginning at line 15, that he fell to the floor in his cell on the evening of September 21, 1985 while getting out of bed and putting "too much weight on the *feet*,"[37] but he did not state that his right foot had been injured (Tr. 520–21).

However, even assuming that Williams' right foot was traumatized in the fall occurrence on September 21, 1985 and that such injury contributed to causing the gangrene, as speculated by Dr. Boxhill, if Williams had been receiving proper care by the medical staff for his infected foot on September 21, 1985, he would have been *hospitalized and at complete bed rest* and

---

**37.** It appears that when Williams used the plural term "feet," the context of his testimony would indicate that he really meant the singular

"foot" and this appears also to be the case when he was referring to swelling in his "feet."

not still hobbling around on his infected painful foot with a cane or crutches. Hence, if Williams fell on September 21, 1985 while putting pressure on his infected and painful[38] right foot while getting out of bed and, as contended by defendant, traumatized the infected foot, which led to gangrene, the resulting amputation must still be ascribed to the improper care furnished Williams with regard to his infection by the Otisville medical staff on that date.[39]

September 22, 1985

Williams was continuing to suffer from severe pain and swelling in his right foot, drainage of pus, and he now observed a bloody infectious-looking (red serosanguinous fluid) discharge from the plantar surface medially of the fifth toe.[40] Gessleman was called to Williams' cell at the early morning hour of 12:32 A.M. and found Williams' foot to be so painful that Gessleman was unable to manipulate Williams' toes to examine the web spaces. Williams' temperature was an elevated 99.8 degrees, indicative of infection. What had started as a tiny fistula had by now widened and become a draining fissure. Gessleman noted on Williams' chart "rule out infection."

Dr. Lord testified: Gessleman's assessment on September 22nd to "rule out infection" is "absolutely incredible." There was already pus pouring out from September 17th (5 days of draining pus), and a swollen and tender foot: this was 100 percent evidence of infection (Tr. 245–46). By Sept. 22, 1985, it was obvious that Williams had an infection, and the entry on his chart "rule out infection" was most inappropriate (Tr. 697). As put by Dr. Lord, "It is per-

fectly obvious he had an infection, so to rule it out is just, I think, the silliest statement that I could have read in the chart" (Tr. 697).

September 23, 1985

Dr. Rossi received a telephone report from Roche at 8:00 A.M. relative to the culture. The report: Williams' foot was infected by a *Keflex resistant* E. Coli bacterium sensitive only to the antibiotics Gentamicin, Tobramycin and Carbenicillin. Hence, the oral antibiotic with which Williams was being treated since September 17th was now discovered to have been totally ineffective for his infection. Williams' white blood cell count was still abnormally high (16,000) and cellulitis was noted. For the first time, Williams' right ankle was swollen and his Dorsalis Pedis pulse was difficult to detect. The medical staff at Otisville concluded that Williams' condition had rapidly deteriorated in the previous 24 hours and that Williams required immediate intravenous antibiotic therapy at an outside hospital.

At 9:30 A.M., Dr. Rossi transferred Williams on an emergency basis to Horton Hospital for immediate intravenous antibiotic treatment, *but failed to transmit Williams' medical records or even a note to Horton as to the reason he was being transferred to the outside hospital.* Dr. Boxhill stressed that "[h]ospitalizing him [Williams] was a definite improvement in the caliber of care that he was getting over the condition prior to 9/22" (Tr. 503). *But, plainly Otisville was astonishingly careless in transferring Williams to Horton without any medical history.*[41] Dr.

---

**38.** Referring to time when he fell off his bed upon putting pressure on his right foot, Williams stated in his deposition of April 4, 1989, page 163, "By that time I was in a lot of pain. I think if I had a pistol, I would have blew the foot off, it got to that point" (Tr. 586).

**39.** Williams testified in his deposition that he had fallen down in his cell and that was the reason for calling the PA to his cell. Such a fall, if it actually occurred, would have been consistent with Williams' instability because of his improperly treated infected painful foot, failure of Otisville to confine him to bed rest, and Williams' need to ambulate with a cane or crutches. Therefore, any fall by Williams in his

cell and resulting trauma to his foot resulted from Otisville's negligent medical care of Williams' foot infection.

**40.** Dr. Boxhill attributed the discharge from Williams' right foot to the fall in his cell (Tr. 495), but there is no evidence of what, if any, injury occurred as a result of the fall (Tr. 520).

**41.** Dr. Rossi testified in his deposition that within the Bureau of Prisons, an inmate's "full chart" followed him from facility to facility: "All his past evaluations, all his past medications, all of his past X-rays and laboratory findings, all of the opinions of outside consultants, would all be in a certain specific section

Lord testified: Otisville acted shockingly below the standard of acceptable medical care when it transferred Williams to Horton Hospital without his medical records, particularly the records from Sept. 17 to the 23, 1985, which would have shown, *inter alia:* pus had been draining from Williams' right foot since the 17th; a culture sent to Roche Laboratories on the 17th was reported on September 23rd to disclose an E. Coli infection; Williams had been receiving only Keflex to which the E. Coli organism was not sensitive and the E. Coli infection was sensitive to only three antibiotics that had to be administered intravenously; and Williams was being transferred to Horton on an emergency basis for such intravenous antibiotic treatment.

Transmittal of Williams' pertinent medical history, or an appropriate summary thereof, to Horton was the responsibility of Dr. Rossi and his medical staff who failed in that vital responsibility. "A good history is perhaps a cornerstone of a diagnosis, and diagnosis is the cornerstone of proper therapy" (Tr. 249). Dr. Lord felt there was still a *tiny* chance Williams' leg could have been saved by an operation on the night of September 22nd or first thing in the morning,[42] but without knowing he had an infection, "they [Horton Hospital] had to fly blind" (Tr. 250). "Good medical care implies that you don't send a person from one hospital to another or one facility to another without any history at all" (Tr. 251). "A good history is usually more valuable in diagnosis than the physical examination or even than extensive laboratory studies." *Medicine, Essentials of Clinical Practice,* by Robert W. Wilkins, M.D. and Norman G. Levinsky, M.D. (2d Ed., 1978).

In Dr. Lord's opinion, and the court fully concurs, Otisville's failure to: (1) employ proper diagnostic methodology to rule out an *apparent* infectious process at an *early stage,* including the failure to request an expedited laboratory report from Roche on September 23, 1985 and *timely* diagnose Williams' E. Coli infection; (2) promptly employ the basic treatment modalities for the diabetic infected foot, as articulated by Dr. Lord; and (3) transmit Williams' medical records or a summary thereof to Horton Hospital, led to the devastating result that Dr. Ellison was left with no option but to first amputate Williams' right fifth toe, and ultimately his right leg below the knee. Defendant's own expert witness, Dr. Boxhill, stressed that early diagnosis of infection and its prompt aggressive treatment were important in the case of the diabetic patient, particularly in the case of Williams who, according to Dr. Boxhill, was at high risk in the event of infection to begin with.[43] Hence, the Otisville medical staff should have been "on the lookout for" an infection in Williams' painful and tender right foot (Tr. 575).

## IV.

### *Macrovascular disease*

The expert testimony establishes that diabetes is associated with both large and

---

of the chart" (Rossi Dep. Tr. 37). Dr. Ellison testified that when transferring patients to Horton Hospital, Otisville transferred little, if any, records with the patient: "it's a mixed bag, sometimes you get information, sometimes you don't"; and it was very uncommon for Horton to receive a full history (Tr. 335–36).

42. From the medical records, there is no evidence that there was gangrene in the toes or foot of Williams up to Sept. 22, 1985. Hence, according to Dr. Lord, if Williams had been given appropriate surgical care and the infection had been drained properly, the toe, and in turn the leg, might have survived (Tr. 251).

43. As Dr. Boxhill believed that Williams had microangiopathy (which he thinks is universal in diabetics), neuropathy (as diagnosed and treated in early July, 1985 by Dr. Rossi) and was a cigarette smoker, Williams was regarded by Dr. Boxhill as a "sitting duck" if an infection developed in his foot. Dr. Boxhill stressed that Williams' vulnerability to vascular complications made it all the more important for the examining physician to be more alert for signs of infection. As discussed *infra,* on the basis of the record presently before the court, it appears that Williams had no significant microangiopathy or neuropathy in September 1985. Nonetheless, as in the case of any diabetic, Williams was a potential candidate for those complications (which can be aggravated by smoking), and therefore, early diagnosis and prompt and aggressive treatment of a foot infection were clearly vital to Williams. To use Dr. Boxhill's words, since a foot infection in Williams would have been "a very serious complication," his physicians should have really been on the "lookout for it" (Tr. 575, 652–53).

small vessel disease.[44] The court initially addresses the issue of whether any occlusive macrovascular (large vessel) disease in Williams' extremities due to his diabetes played a significant role in the etiology or course of the infection, necrosis and gangrene.

Dr. Boxhill believed that when Williams' right leg was amputated in September 1985, he had an ischemic right foot caused primarily by diabetic macro and micro vascular disease (Tr. 449). According to Dr. Boxhill, the gangrene indicated there was an ischemic process where the blood flow to the tissues was very poor and the tissues had died (Tr. 455). However, in Dr. Lord's opinion, which the court finds more credible, neither diabetic macro or micro vascular disease played any significant role in the development of gangrene, and there was *no ischemia present in Williams' right foot or leg prior to the development of the infection* in early September 1985 (Tr. 791). Dr. Lord's opinion is substantially buttressed and confirmed by both the Springfield Hospital aortogram in January 1986 (Tr. 791) and the Horton Hospital pathologist's report which found essentially almost no atherosclerosis in the posterior tibial and perineal arteries of the right leg (Tr. 790) (together demonstrating that the arterial circulation was identical from the groin down to the feet) and by the fact that the left foot four years later (in 1989) with more diabetic history was warm, free of edema, and had normal sensation. Dr. Lord concluded there was no reason to believe that Williams' right leg was any different in September 1985 (Tr. 791). The findings in the lower extremities are usually parallel (*Id.*). Finally, the fact that the area immediately below the amputation healed so well suggests that Williams had good collateral circulation coming around the short obstruction in the superficial femoral artery (Tr. 790).

Hence, defendant's argument that the critical factor leading to the amputation of Williams' right leg was an ischemic condition caused by diabetic vascular complications rather than the infection is completely refuted by the weight of the credible evidence.

In several of his visits to the clinic in July and August 1985, Williams complained of pain in his calf muscles on walking, which Dr. Lord testified was correctly diagnosed by Dr. Rossi as intermittent claudication. Intermittent claudication (circulatory insufficiency) is caused by some obstruction in a major artery, in the aorta or iliac arteries or common femorals or superficial femoral arteries above the area where the discomfort is felt when a person walks a certain distance. In Williams' case, this blockage was shown to be in the distal superficial femoral artery on both sides identically, and thus he felt a discomfort in his calves when he walked several blocks. (Tr. 750–51).

Predicated on the post-amputation report, *"Aortogram with run-off,"* from the Department of Radiology and Nuclear Medicine at Springfield Community Hospital, Springfield, Missouri, dated January 27, 1986 (Joint Exh. 1B, sec. 4, p. 100421), Dr. Lord pointed up that there was good filling of the vessels and flow of the dye to the distal part of the extremity. *And the Horton pathologist's report* shows that the aorta was "essentially minimally atherosclerotic, the iliac arteries were essentially normal and the common femoral arteries were essentially normal" (Tr. 254). However, the superficial femoral artery had a local and segmental atherosclerotic occlusion in the Hunter Canal, or the adductor canal, which is located 2 to 5 inches above the knee. There was a short obstruction in the mid-left superficial femoral artery (for about 4 or 5 centimeters) with reconstitution of circulation in the popliteal arteries, and the left side of the angiogram showed excellent flow into essentially normal tibial arteries to the foot. In commenting on the Horton pathologist's report, Dr. Lord stressed that Williams' vascular arterial

44. The vascular complications from diabetes may be pervasive and include diabetic eye and renal disease, but there is no evidence that Williams suffered from either of those complications (Tr. 214, 217). The focus in this case is on whether Williams had microangiopathy or atherosclerosis affecting his right foot and leg below the knee, and if so, to what degree.

system showed minimal atherosclerosis of the tibial arteries in the amputated leg, demonstrating he had good circulation. The mild atherosclerosis in the tibial artery found in the right leg by pathological examination and in the left leg by aortogram showed that the circulation in both lower extremities was identical (Tr. 254–55).

Although Dr. Lord believed that Williams suffered from mild macrovascular arterial disease, he explained: notwithstanding there were *localized obstructing lesions* in the distal superficial *femoral and the iliac arteries,* beyond that, the *popliteal and the tibials* were relatively normal. Therefore, "you have to incriminate something above and beyond the fact that there was a minimal atherosclerotic problem" (Tr. 255–56). The atherosclerotic occlusion of the superficial femoral artery in a very short extension (about five centimeters) affected Williams' circulation in that symptomatically Williams experienced "intermittent claudication" and hence had pains and some cramping in some of his leg muscles (calf muscles, gastrocnemius, and soleus) after walking for a certain distance at a certain speed. In the physical examination, one would expect to find little or no pulses in the foot (Tr. 257–58).

Dr. Boxhill disagreed somewhat with Dr. Lord's conclusions concerning Williams' macrovascular disease, and notwithstanding the January 27, 1986 Springfield Hospital aortogram, Dr. Boxhill believed there was macrovascular disease affecting Williams' right leg below the knee (Tr. 535–36). Contrary to Dr. Lord's conclusion that there was only *mild* macrovascular disease in Williams' legs, Dr. Boxhill believed that "the occlusion of the right superficial femoral artery would constitute a significant macrovascular disease which would serve to reduce blood flow to the leg" (Tr. 537).

Dr. Boxhill relied on the noninvasive diagnostic vascular studies done with a Doppler to measure the difference between the brachial or arm blood pressure and the pedal blood pressure in a lower extremity to determine the existence of a deficit ("API index") which is "helpful, *but not as accurate as an aortogram*" (Tr. 538, emphasis added). The Doppler study showed an API index of 46% on the left leg which, according to Dr. Boxhill, indicated that Williams had vascular insufficiency in the left leg at the time of the study (Tr. 538–39).

The court gives more weight to the combination of the Springfield Hospital aortogram, Horton Hospital pathologist's report and Dr. Lord's testimony that all establish there was insufficient reduction of macrovascular blood flow to Williams' right leg to have significantly affected the development, course, treatment, or outcome of the infection or suggest any significant role of macrovascular disease in the etiology of the infection or gangrene. Dr. Lord concluded, and the court agrees, that the aortogram and Horton Hospital pathologist's report clearly demonstrate that from September 6th Williams' problem in *only his right foot* was negatively impacted by some *critical factor other than a macro or microcirculatory insufficiency* (namely, the E. Coli infection) as readily conceded by Dr. Boxhill in his supplementary report of August 4, 1989 and trial testimony.[45] As Dr. Lord read Dr. Boxhill's report, Dr.

---

**45.** Dr. Boxhill's report of May 2, 1989 states that Williams had a deep venous thrombophlebitis (blood clots or thrombi and inflammation in the deep veins) which would account for bilateral leg edema, that was found in 1981. However, Dr. Lord testified that Dr. Boxhill's finding is pure speculation since Williams never had a venogram, which is the only way to affirmatively diagnose or conclusively establish whether or not a person has deep venous thrombosis (Tr. 262, 265). There were no findings at Otisville indicating that Williams had swelling of the feet and legs prior to the swelling of the right foot reported on Sept. 6, 1985 (Tr. 262).

Moreover, Dr. Ellison in his admitting note at Horton states that while the right foot was markedly swollen, the left leg was unremarkable: Dr. Lord pointed out that this comment indicates that there was no edema and denigrates Dr. Boxhill's speculation that there was deep venous thrombophlebitis (Tr. 264). More, the Horton pathologist report on the amputated limb states that there was no evidence of venous thrombi; if Williams had deep venous thrombosis, there would have been signs that would have been recognized by the pathologist grossly and microscopically in the veins of the amputated leg (Tr. 264).

Boxhill agreed that infection is the process which led to amputation (Tr. 273).

## V.

### *Microvascular disease*

Again giving more credence and weight to Dr. Lord's testimony than to the contrary views of Dr. Boxhill,[46] the court finds there was no diabetic microvascular pathology present in Williams' right foot or leg in 1985 prior to the amputation (Tr. 774). Dr. Lord based his opinion on the Horton pathologist's report of Oct. 1, 1985, stating: "There are seen small arterioles that are *occluded with early organizing thrombi*" (Tr. 775, emphasis added).

The pathogenesis of the "early organizing thrombi" was explained by Dr. Lord: "[W]hen the pressure became so great due to cumulated pus in the deep—to the deep fascia and in a relatively close space, that narrowed the arteries externally and led to impaired flow, which led to thrombi or clots and early organizing thrombi" (Tr. 775). Since there were fibroblasts growing in from the periphery of the clot, this meant that early organizing occurred two to four or five days prior to examination of the specimen (Tr. 775–76). The fibroblasts grew in because at the original operation two days before the amputation of the leg (9/28/85), where the fifth gangrenous toe was amputated, the entire tract back to the heel was laid open to nearly the internal malleolus, and the tract contained a considerable volume of pus and liquid (Tr. 776). Like a hemorrhage in the skull, in the plantar aspect of the foot under the deep plantar fascia, there is no opportunity for expansion of the tissues "that will not give one millimeter," and the smaller vessels must be compressed externally (*Id.*). When the vessels are so compressed, blood flow slows and often thrombi are formed. This was the process by which the early organizing thrombi were formed that oc-

cluded the arterioles. Early connective tissue cells are formed where the migrating monocytes become connective tissue cells and fibroblasts grow in (Tr. 776–77).

Continuing, Dr. Lord noted that in the pathologist's report for the toe amputation, there is not a word about any small vessel disease (Tr. 777). Thus, microangiopathy (arteriole walls showing substantial thick deposits of endothelial basement membrane material with a decreased lumen of the vessel) was not found in Williams' amputated limb, since the pathologist did not find any diminution in the size of the arterioles. Williams did have early organizing thrombi, "which has nothing to do with microangiopathy" (Tr. 733).

As testified by Dr. Boxhill, the early organizing thrombi indicated that the thrombi had formed within a week's time and had not yet been recolonized. Hence, this was an early reaction compatible with infection in which vascular toxic enzymes were being elaborated by bacteria, causing thrombosis in those arterioles (Tr. 568).

Thus, on the basis of Dr. Lord's testimony, the court finds that the occlusion of the arterioles in Williams' amputated right leg noted in the Horton pathologist's report was a direct response to the infectious process in Williams' foot rather than to microangiopathy. Such occlusive process which resulted in insufficient blood flow (and hence insufficient oxygen) to the tissues, of course, further complicated the course of the infection, which result in turn led to further occlusion by early organizing thrombi. This circular, cumulative and increasingly worsening occlusive process culminated in necrotic tissue and gangrene necessitating the amputation of the affected tissue.

Dr. Lord further stressed that small vessel disease takes years to develop in a mild diabetic like Williams, who was on oral

---

**46.** Dr. Boxhill believes that Williams suffered from microangiopathy based on the fact he is a diabetic and there is evidence of microangiopathy today on his left leg, which would indicate the presence of microangiopathy several years ago (Tr. 451). The evidence of microangiopathy pointed out by Dr. Boxhill is that Williams has

dermopathy (pathology of the skin that results in the formation of diabetic shin spots or a scar or area of hyperpigmentation). Dr. Boxhill asserts that these shin spots are an indication of microvascular insufficiency (Tr. 451–452, 664). However, Dr. Lord testified that shin spots are usually the result of injury (Tr. 699).

medication (Diabenese), and is not characteristic of an early mild diabetic (Tr. 789). Moreover, as pointed out by Dr. Boxhill, the ability to develop enough vascular disease in the legs resulting from the complications of diabetes to necessitate amputation is in part a reflection of the duration of the disease; *and in Dr. Boxhill's experience, it was unusual for a diabetic in the forties to have an amputation. It much more commonly occurs in the fifties and sixties* (Tr. 441–42). As mentioned *supra,* Williams was age forty-eight at the time of his amputation and was originally diagnosed a diabetic in 1980.

Dr. Boxhill believed that in a diabetic with microangiopathy, an infection by a necrotizing organism would likely lead to gangrene, but that the infection would lead to the gangrene rather than being a secondary result of the gangrene (Tr. 456).[47]

Even assuming the correctness of Dr. Boxhill's broad assertion that some degree of microangiopathy is a universal finding in diabetics (Tr. 665) (there is substantial scientific evidence to the contrary), nevertheless, the court must determine whether the degree of microvascular disease present in a particular diabetic patient such as Williams was sufficient to produce an ischemia that so devitalized the foot to the point where it invited an infection that culminated in gangrene. On the record of this case, the court finds that microvascular disease in Williams' right leg, if present at all, was very minimal and not a significant factor in the infectious process or the development of gangrene.[48]

Dr. Lord was read another portion of Dr. Haimovici's text by plaintiff's counsel, *Vascular Surgery, Principles and Techniques, supra,* covering "Preoperative Evaluation of Vascular Diseases":

> A question which is always raised and is of considerable importance relates to the concept of 'diabetic-vessel disease.' The evidence for the existence of a specific lesion of small arteries and arterioles remains unsettled and reports, both supporting and refuting its existence, have been published, and it is the author's opinion that a specific lesion does not exist. Furthermore, the location and distribution of disease involving the large and medium-sized arteries are sufficient to explain the increased incidents of necrosis in gangrene patients with diabetes mellitus.

Tr. 772–73.

Dr. Lord conceded that some authorities believe microangiopathy exists in diabetics and some authorities of equal stature state it does not exist. However, regardless of which authorities are correct, Dr. Lord believed that in Williams' case in 1985 prior to the amputation, there was no significant degree of microangiopathy present (Tr. 773–74). Based on the entire record, the court agrees.

Further, the court determines that even assuming *arguendo* Williams had a mild microangiopathy in his right leg, the infectious process was nonetheless controllable by the basic accepted standards of medical practice applicable to the infected diabetic

**47.** In his report of May 2, 1989, Dr. Boxhill explains how microvascular disease promoted rapid advancement of the infection:

"Pathological examination of the amputated right lower leg on 10/1/85 also disclosed early organizing thrombi in the small arterioles. These changes represent the consequence of infection more likely than its cause, but also imply the presence of underlying microvascular disease which prevented collateral blood flow in the face of infection. These microcirculatory changes would have served to hasten the progression of infection by rendering the tissues of the foot deficient in oxygen and non-viable leading rapidly to gangrene. In summary, *I do not believe that Mr. Williams suffered symptoms of circulatory insufficiency based on vascular and pathological studies in the record.* However, he

did have sufficient microvascular insufficiency so that the introduction of infection into the right foot was followed by a devastating, rapidly spreading process, which would be difficult to control by simple measures." (Emphasis added.)

**48.** When Dr. Boxhill was flatly asked whether in his opinion ischemia was present in Williams' right leg prior to his infection, Dr. Boxhill hedged: "I believe there is always an element of ischemia in a patient with microangiopathy, *but I have no way of telling you whether or not these ischemic changes that were present in the pathology specimen were of recent vintage [as contended by Dr. Lord] or were chronic*" (emphasis added) (Tr. 456).

foot as outlined by Dr. Lord, *supra.* It must be stressed that during the pertinent period of time in this case, September 1985, Williams' diabetic condition was essentially under control.

## VI.

### *Williams' cigarette smoking*

The court now addresses the medical issues surrounding the fact that Williams was a smoker. There is no dispute in the medical literature that cigarette smoking is a major risk factor for diabetics, particular those already suffering from atherosclerotic disease and other vascular complications (admittedly smoking multiplies the risk of vascular occlusion, ischemia, myocardial infarction, and other complications (Tr. 438–39)). Defendant strenuously argues that Williams' cigarette smoking exacerbated the complications of his diabetes, particularly circulatory insufficiency secondary to his diabetes, and therefore smoking contributed to the need for Williams' amputation, pain and suffering. The court disagrees.

The specific effects of cigarette smoking on particular diabetic patients and the complications of the disease can *vary widely,* depending upon a host of other risk factors, including *inter alia,* the patient's age, duration and severity of the patient's diabetes and the effects of the disease on the vascular system and general health, the extent of the cigarette smoking habit, the success of the patient in keeping the disease under control through diet, exercise, medication, etc., presence of obesity, genetics, etc., etc. Given these complexities, the obvious issue is whether in light of Williams' particular personal background and medical history, cigarette smoking adversely affected or contributed to the development, course of and treatment of the E. Coli infection and resulting gangrene and amputation. The evidence of record compels a negative response.

Williams, 48 years of age at the time of the amputation in 1985, had a Type II diabetes mellitus (mild, controllable by diet and oral medication; non-insulin dependent (Rossi Dep.Tr. 25; Rochacewicz Dep. 15)) for approximately five or six years. Furthermore, the evidence shows that in September 1985, Williams' diabetes was under good control.[49] While diabetic vascular disease has a pervasive impact on the patient's total health, particularly the eyes (diabetic retinopathy) and kidneys (diabetic nephropathy), there is no proof that in 1985 either Williams' eyes or kidneys had been adversely affected by his diabetic condition or by smoking (Tr. 552).

Importantly, the court finds on the basis of the evidence presented that any adverse effects of diabetic vascular disease (atherosclerosis or microangiopathy) on Williams' right foot and leg prior to his amputation were minimal,[50] and further that any adverse effect of cigarette smoking on diabetic complications or exacerbation of Williams' infection by cigarette smoking was *de minimis* or nonexistent.

Dr. Boxhill's testimony that if Williams had stopped smoking on September 12,

---

**49.** Dr. Boxhill's report states: "In 1981 Mr. Williams was begun on Insulin treatment while at Ft. Leavenworth, and the following year switched to oral antidiabetic treatment using Diabinese or Chlorpropamide 250 mg daily. Measurement of the Glychomoglobin in the blood on 6 occasions between 11/81 and 6/84 indicate *excellent control of his Diabetes throughout this period* which was uninfluenced by the switch from Insulin to oral agents. By 1985, and at the time of his transfer to Otisville F.C.I. the dose of Diabinese had been increased to 500 mg/day. One fasting blood glucose of 80 (obtained in 5/85) and a random blood glucose of 171 in 3/85 suggest that Mr. *Williams continued to enjoy good control of his Diabetes while at Otisville F.C.I."* (Tr. 636, 647, emphasis added)

There is no evidence whatever that Williams' failure to attend the diabetic clinic on May 9 and July 11, 1985 caused his diabetes to go out of control (Tr. 639). In point of fact, on September 16, 1985 Williams had a normal fasting blood sugar of 80 mg. (presumably by finger stick test since there was no laboratory report) (Tr. 648).

**50.** The court recognizes that Dr. Boxhill was of the view that "microvascular insufficiency was an accessory factor *contributing* to devitalization of the foot which invited blood borne infection; and that infection in turn served to exacerbate the ischemia leading to gangrene." *See* Dr. Boxhill's report of August 4, 1989; Joint Exhs. 4, 5, 6 and def't exh. 1.

1985 (when he was admonished only to *reduce* his smoking), he would have (1) received an immediate "benefit" and (2) his chances of avoiding amputation *might* have been improved is obviously vague as to the former conclusion and purely speculation as to the latter. Moreover, Dr. Boxhill's belief that smoking was a very important reason for the worsening of Williams' infection is bottomed heavily on his opinion that Williams already was afflicted with significant ischemia due to atherosclerosis and microangiopathy, and that the smoking exacerbated Williams' diabetic complications and hence the ischemia. But, as indicated *supra,* on the basis of Dr. Lord's highly credible testimony and other convincing evidence of record, the court holds that in September 1985, Williams' right foot and leg below the knee suffered neither from significant microangiopathy nor atherosclerosis.

To summarize, defendant's position is essentially that after "inviting" his infection, Williams' alleged diabetic atherosclerosis and microangiopathy caused ischemia in his right foot and leg leading to gangrene, and that these diabetic complications, ischemia and the infection were significantly exacerbated by smoking cigarettes. The court, however, finds: first, that the effects of any diabetic atherosclerosis and microangiopathy on Williams' right leg below the knee and foot was very minimal; and second, that the extent to which cigarette smoking aggravated any diabetic complications or the infection, or contributed to ischemia and gangrene was *de minimis.*

Further, although the fact of Williams' smoking is relied on heavily by defendant as an aggravating circumstance in Williams' infection, ischemic condition and gangrene, no attempt was made by defendant through Dr. Boxhill's testimony or otherwise to *quantify* the percentage (or other mode of measurement) of contributory fault. Accordingly, as discussed *infra,* there is no basis on the record for the assessment by the court of any specific degree or percentage of comparative or contributory fault on the part of Williams for the amputation because of his smoking.

In Dr. Lord's opinion, Williams' smoking habit had nothing to do with his immediate problem from Sept. 6 to September 23, 1985 when Williams' infected foot was improperly diagnosed and treated at Otisville, and worsened (Tr. 294). Dr. Lord noted that despite the fact that Williams continued to smoke to the date of the trial, Williams still has an excellent left foot (Tr. 269–270). Williams still suffers from "a very slight degree of microvascular disease in his left foot" and still has a blockage in the superficial femoral artery of 4 centimeters long with good collateral circulation (Tr. 270). Microvascular disease is a bilateral phenomenon; Williams has the same small vessel disease in his left foot as was present in his right, yet he still has his left foot (Tr. 272–273). Essentially, then, infection was the "overwhelming reason that he lost his right leg" (*Id.*).

## VII.

### *Diabetic neuropathy*

Dr. Boxhill testified that diabetic neuropathy in the feet might predispose the patient to infection. The nutrient cells of the nerves are affected by diabetes causing irreversible damage, and most commonly the longest nerve trunks are affected most severely especially affecting a diabetic's feet. Microangiopathy can lead to or aggravate damage to the nerves and thus cause neuropathy. In turn, neuropathy can cause venous disfunction (blood pooling), which produces swelling of the legs and feet and edema (Tr. 426–28).

Dr. Boxhill reported on May 2, 1989 regarding Williams:

Swelling and tenderness of the right foot and neuropathic-type pain of the calves were present for a considerable period of time before the actual appearance of infection (for two months or longer). Although the swelling was not described by Dr. Rossi or his assistants it was obvious to Mr. Williams as stated in his deposition. The swelling may have been dependent (at the end of the day) and subtle enough to be missed through visual inspection. (Patients with chronic edema often complain that the swelling is

missed by the physician.) The swelling in Williams' foot was a direct consequence of Diabetic Neuropathy (through loss of venomotor tone) and of chronic venous insufficiency. A chronically swollen foot and lower leg are more readily susceptible to infection resulting from stretching of the skin and bacterial invasion, along with impaired circulation and host-defenses.

For several months in 1985 Williams was treated with megavitamin therapy, *i.e.*, B1 and B6, predicated on a diagnosis of diabetic neuritis, although he had not been tested for such disease. According to Dr. Boxhill, such treatment while harmless, is ineffectual for diabetic neuritis (Tr. 573). In any event, regarding his symptoms, Williams showed no beneficial response to the vitamin therapy.

Dr. Boxhill further noted that in 1981–82 Williams had been treated with diuretics for swelling of his feet and Dr. Boxhill believed that Williams suffered from such swelling intermittently. However, if Williams suffered from intermittent swelling in 1981–82, its causal connection to the infectious process in 1985 was not established.[51]

After examining Williams during trial, Dr. Boxhill testified that he found *subtle* signs of diabetic neuropathy (dermopathy or "shin spots"), and he inferred from such signs that Williams may have had diabetic neuropathy in 1985 (Tr. 561).

Relative to Williams' complaints of local tenderness in different areas of his right foot on September 6, 12, and 15, 1985, Dr. Boxhill opined in his report of May 2, 1989 that "[i]n the context of Mr. Williams' previous medical difficulties, it was appropriate to attribute this migrating pattern of tenderness to his Diabetic Neuropathy or Osteopathy and to treat the pain symptomatically with analgesics (Motrin or Ibuprofen)." Although in diabetic neuropathy, there is ordinarily an atrophy or wasting of muscular substance in the areas that are fed by the damaged nerves, when Dr. Boxhill examined Williams' left leg in the courtroom he could observe no atrophy (Tr. 467–68).

Dr. Lord saw nothing in the Otisville records suggesting that Williams suffered from diabetic neuropathy or that Williams was even given appropriate testing for such diagnosis (Tr. 215). More, from review of his medical records and a physical examination of Williams' left leg and foot before testifying, Dr. Lord found that Williams had no peripheral neuritis, which in a diabetic patient is a permanent condition (Tr. 265). Dr. Lord's clinical examination of Williams' left foot showed "excellent collateral circulation" and after neurological testing by touching, and a pin prick, Dr. Lord concluded that there was no evidence of diabetic neuropathy as of November 1989 (Tr. 215–16). According to Dr. Lord, if Williams had diabetic neuropathy in 1985, his condition in 1989 would have been the same as, or worse than in 1985, not better.[52]

"Shin spots," according to Dr. Lord, are more apt to be a symptom of injury (Tr. 699), and in any event, there is nothing in the Otisville records making reference to dermopathy or shin spots prior to the amputation, and if one were looking for them, they would have been obvious (Tr. 562–63). Moreover, in Williams' medical records at Otisville, there is no evidence of any "pitting" or other degree of edema in Williams' legs (Tr. 263). The first reference to ede-

**51.** In his report of May 2, 1989, Dr. Boxhill stated that the bilateral leg edema episode (swelling of the feet and distal portion of the leg) that Williams experienced commencing in January 30, 1981 (which was treated with diuretics for about two years) was evidence of veno-occlusive or thrombophlebetic obstruction to venous return of the legs; "and this process arose as a result of prior intravenous narcotics administration through the femoral (groin) veins and/or from repeated venipuncture of the femoral veins during his prior hospital treatment, required by the unavailability of peripheral veins in both arms which were scarred by needle use." Williams' "mainlining" (intravenous administration) of heroin occurred in the 1960s (Tr. 40–41)

**52.** Dr. Boxhill agreed that the significance of finding diabetic neuropathy in Williams' left leg is that diabetic neuropathy is usually bilateral and therefore, an inference could be made that it was also present in the right leg.

ma or swelling in the Otisville medical records is Sept. 22, 1985 when Williams had a swelling of his right foot (Tr. 301, 686), and the record is not clear as to the extent, if any, there were any other episodes of edema in Williams' feet in 1985 (Tr. 557–58). In his examination of Williams' left leg at the trial, Dr. Lord saw no evidence of any swelling (Tr. 555–56).

Dr. Lord further stated that pain is not necessarily characteristic of neuritis, and in the absence of trauma, is commonly due to infection (Tr. 786–87); that if a patient has diabetic neuropathy, he may also have an infection in the foot and not even be aware of it (Tr. 787); and that neuritis is characterized by numbness, paresthesia, and the decrease in or loss of ability to sense a touch or pin prick. Since at trial, Williams responded vigorously to Dr. Lord's light touch and pin prick tests for diabetic neuropathy, Dr. Lord concluded that Williams did not have diabetic neuropathy (Tr. 784–85). Dr. Boxhill's *reflex tests* with a hammer and tuning fork, from the point of view of the care of Williams' condition, were of secondary importance (Tr. 785). The important determination was whether Williams had *sensation* in his foot, since diabetics with neuropathy have poor appreciation of light touch and pinprick (*Id.*).

In sum, based on Williams' medical records at Otisville and Dr. Lord's personal examination and credible testimony (Tr. 215–218), the court finds that Williams never had any significant degree of diabetic neuropathy, and such condition played no role in the infectious process or gangrene.

## VIII.

### Use of drugs and alcohol

Williams concededly was a former intravenous drug and alcohol user. However, such intravenous drug and alcohol use was not shown to have caused his diabetes, affected the severity or course of the disease in 1985 or affected the course or treatment of his infection or gangrene.

While intravenous drug use is associated with hepatitis which may injure the liver, making diabetes more difficult to control, there is no evidence that in 1985 Williams suffered from hepatitis (Tr. 444). Even if Williams had residual liver disease from former hepatitis, the court finds no proof that such condition had any effect on his diabetes or relation to the foot infection or gangrene.

## IX.

### Summary of Record

Dr. Lord's credible testimony, as buttressed by the Horton Hospital pathologist's report and Springfield Hospital aortogram report, plainly establishes that the circulation in both of Williams' legs below the knee and feet was substantially identical and substantially unimpaired by macro or microvascular disease (Tr. 254–255, 790–91). In light of these findings, for gangrene to develop in Williams' right foot and leg below the knee in 1985, there had to be a mechanism that was operative in Williams' right foot that was something other than a minimal atherosclerotic, neuropathic or microangiopathic problem (Tr. 256).

After carefully studying the evidence of record and briefs of counsel, the court agrees with plaintiff's position and Dr. Lord's opinion that the mechanism which led to gangrene and amputation of Williams' right leg was the entry of an E. Coli infection in the right foot (most likely through a fissure resulting from a fungal infection in the web space between the toes). Defendant's contention and Dr. Boxhill's thesis that significant diabetic atherosclerosis, peripheral neuritis and microangiopathy (producing vascular insufficiency or ischemia) in Williams' right foot invited a blood-borne E. Coli infection, which rampantly progressed into an uncontrollable occlusion of the arterioles, necrosis, then gangrene, is rejected for the reasons stated herein.

Perhaps somewhat simplistically explained, essentially the pathogenesis of the gangrene leading to the amputation was that the pus generated by the E. Coli infection spread, came under pressure in a confined space pressing against the walls of the arterioles narrowing them, slowing the

flow of blood and causing early organizing thrombi and occlusion, leading to ischemia, and then necrosis and gangrene in the affected tissues of Williams' right foot. According to Dr. Lord, the infectious process led to occlusion of the arterioles by early organizing thrombi in the amputated leg and foot, not diabetic vascular disease, which at best was minimally present.

Fundamentally, of course, diagnosis requires knowledge, skill, persistence and thoroughness, and above all, an open mind. The greatest impediment to accurate diagnosis is an incorrect mental set predicated on faulty assumptions and superficial examinations. As late as September 16, 1985, the day before pus discharged from Williams' infected foot, the investigation by Dr. Rossi of Williams' symptoms and complaints was still not thorough and was seriously hampered by Dr. Rossi's fixation on diabetic neuropathy as the likely explanation for Williams' complaints and, of great significance, *Dr. Rossi's suspicion that Williams was "feigning medical illness"* (Joint Exh. 1A, G001069, emphasis added).

If on September 6, 1985 or shortly thereafter, Otisville had employed appropriate and thorough diagnostic methodology to rule out the possibility of infection in Williams' foot, infection could not have been ruled out. And if there had been prompt adherence to the basic standards of treatment applicable to the infected diabetic foot, the need for a below-the-knee amputation would almost certainly have been obviated (Tr. 213). As stressed by Dr. Lord, "early care of an infection, particularly in a diabetic foot is so much more satisfactory and successful than when it gets far advanced" (Tr. 219).

The critical factors that led to the necessity for amputation of Williams' right leg because of the development of gangrene were: (1) the failure of the medical staff at Otisville to provide Williams with appropriate testing, clinical examinations and diagnostic modalities consistent with his diabetic condition, pain and associated symptoms in his right foot from September 6, 1985 to September 23, 1985; (2) the failure of Otisville commencing on September 6, 1985 (or shortly thereafter) to provide Williams with treatment in accordance with the accepted standards of medical care applicable to a diabetic patient with a possible foot infection; (3) the failure of Otisville after a belated discovery of a limb-threatening infection on September 17, 1985 to request an expedited report on the culture from the laboratory, and pending the report to provide medical treatment in accordance with basic standards of care applicable to the infected diabetic foot; and finally, (4) the failure of Otisville to furnish Horton Hospital with Williams' medical chart or a summary thereof when, unknown to Dr. Ellison, Williams had a spreading E. Coli infection and he was transferred on September 23, 1985 for intravenous antibiotic therapy (which was unavailable at Otisville).

## CONCLUSIONS OF LAW

This action was commenced by plaintiff under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, alleging that while he was under treatment for diabetes at the Otisville Federal Correctional Institution in September 1985, Otisville failed to provide him with medical care and treatment for a foot infection in accordance with the accepted standards of medical practice prevailing in the community at that time, which resulted in a below-the-knee amputation of his right leg. These standards, according to plaintiff, required: more extensive and thorough clinical examination and diagnositic testing of his feet, which would have lead to a more timely correct diagnosis of a foot infection rather than neuritis; a timely consultation with a vascular surgeon or other medical specialist having expertise in the care of the diabetic infected foot; an expedited laboratory report on a culture of his infection; more timely hospitalization with complete bed rest, elevation of his leg, incision and drainage of his infection, and intravenous antibiotic treatment; and other incidental care appropriate to an infected diabetic foot, as specifically outlined by Dr. Lord.

Regarding the disputed questions of fact as to the requisite standard of care and skill demanded of the medical staff at Otis-

ville in relation to plaintiff's foot infection, and the staff's conformity with such standard, the court gives great credibility and weight to the testimony of plaintiff's expert witness, Dr. Lord, and rules in favor of plaintiff.

The Federal Tort Claims Act provides that the United States is liable for injury caused by the negligence of its employees under circumstances where a private person would be liable pursuant to the law of the place where the negligent act or omission occurred. *Hess v. United States*, 361 U.S. 314, 317–18, 80 S.Ct. 341, 344–45, 4 L.Ed.2d 305 (1960). Since the alleged negligence of defendant occurred at Otisville, the law of New York applies.

The United States Supreme Court has held that the government has an obligation to provide medical care for those whom it punishes by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *reh'g denied*, 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977). No claim is made by plaintiff in this case that he was denied medical care or was deprived of his constitutional or civil rights. The only issue is whether, in conformance with the decisional law of New York, *infra*, plaintiff's medical care at Otisville met acceptable standards in that community in 1985.

The general standard of care for physicians in New York has been long and well established by *Pike v. Honsinger*, 155 N.Y. 201, 49 N.E. 760 (1898), wherein the court stated:

> The law relating to malpractice is simple and well settled, although not always easy of application. A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant

with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery. Upon consenting to treat a patient, *it becomes his duty to use reasonable care and diligence in the exercise of his skill* and the application of his learning to accomplish the purposes for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge. *The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment.*

155 N.Y. at 209, 49 N.E. 760 (emphasis added).

There is no dispute that the foregoing statement represents the current law in New York. *See e.g., Wilson v. United States*, 613 F.Supp. 1322, 1326 (E.D.N.Y. 1985); *Pepe v. United States*, 599 F.Supp. 798, 802 (E.D.N.Y.1984); *Littlejohn v. State of New York*, 87 A.D.2d 951, 451 N.Y.S.2d 225 (3rd Dept. 1982); *Twitchell v. Mackey*, 78 A.D.2d 125, 434 N.Y.S.2d 516 (4th Dept.1980); *see generally, Sitts v. United States*, 811 F.2d 736, 739–40 (2d Cir.1987).

Defendant strenuously denies that the Otisville medical staff provided Williams with below-standard medical care relating to the diagnosis and treatment of his foot infection. Specifically, defendant argues that based upon the testimony of Dr. Boxhill, the amputation was necessitated by a deep and rapidly spreading infection in Williams' right foot leading to gangrene, hastened by the complications of Williams' diabetic macrovascular and microvascular insufficiency and diabetic neuropathy in his lower extremeties, which made the rapidly spreading process difficult to control by simple measures. Defendant further posits that Williams' cigarette smoking,[53] and

---

**53.** In 1980, plaintiff was told by a physician with the Federal Bureau of Prisons that smoking could have a "negative effect" on his diabetes (Pretrial Order, Agreed Findings of Fact, par. 7). However, Williams' medical chart at Otis-

ville does not explicitly state that he was advised to stop smoking. An arrow pointing down on Williams' medical chart (Joint Exh. 1A, G001069) indicated that Williams was admonished only to "cut down" on smoking (Rocha-

former drug and alcohol use, contributed to and excerbated his diabetic complications and the necessity for the amputation of his leg.

The court disagrees with defendant's arguments. Even allowing some possible role in the etiology and course of the infectious process and gangrene for diabetic vascular disease and neuropathy as predisposing and/or exacerbating factors, the court finds that the infection itself and the far below-standard medical care and management by the Otisville medical staff in regard to the infection from September 6 to September 23, 1985 were clearly the critical factors in and proximate cause of the gangrene and the necessity for the amputations.

The preponderance of credible evidence, adduced principally through the superbly qualified Dr. Lord, establishes to the court's satisfaction that the E. Coli infection, rather than microangiopathy, resulted in the formation of early organizing thrombi in Williams' right foot and leg causing an occlusion of circulation in the arterioles. *See* the Horton Hospital pathologist's report. Such occlusive process led to ischemia, necrosis and gangrene which necessitated the amputation. Dr. Lord's testimony convinces the court that any contribution to the occlusive process and ischemia of diabetic microangiopathy or neuropathy was *de minimis* or nonexistent. Accordingly, in view of the *essentially overwhelming bacterial pathogenesis of the occlusive process in the arterioles that led to gangrene, with minimal or nonexistent contribution of atherosclerosis, microangiopathy or peripheral neuropathy,* as posited by Dr. Lord, the court finds that Williams' cigarette smoking, prior intravenous drug and alcohol use played no significant direct or contributory role in the etiology or course of the infectious process or gangrene necessitating the amputation. Accordingly, the court finds that there was no contributory or comparative negligence by Williams predicated on his use of cigarettes, drugs or alcohol.

Inasmuch as the court determines that the preponderance of the credible evidence establishes the E. Coli infectious process played the critical effective causal role in the formation of early organizing thrombi in the arterioles, and hence in the occlusive process and ischemia leading to gangrene and amputation, the pivotal issue must be addressed as to whether defendant's medical care and management of Williams' infected foot were below the basic standards required to be observed in the community at the time in question.

In summary, for the reasons meticulously articulated by Dr. Lord, the court holds that the medical staff at Otisville seriously departed from and breached the basic standards of care owed to a diabetic patient in the diagnosis and treatment of a foot infection. The specific negligent errors and omissions by Otisville are discussed in the Findings of Fact and detailed repetition of the particulars here is unnecessary.

The court reiterates that the evidence in this case is insufficient to implicate the institutional shoes furnished plaintiff upon his arrival at Otisville in the development of Williams' foot infection. The court must observe, however, that since Williams was a known diabetic, the furnishing to him of grossly oversized shoes by the personnel at Otisville suggests an incredible indifference by the prison officials regarding the potential medical and legal consequences of such action, as this case illustrates.

The record establishes that the infection incurred by Williams became apparent long before the development of the rapidly spreading gangrene focused on by defendant. Infection in the diabetic foot is not, by any means, a rare occurrence, and Williams' symptoms and complaints from September 6, 1985 or shortly thereafter, were consistent with an infection. At that point in time, the possibility of an infection should have been thoroughly investigated by proper clinical examinations, and if infection could not be ruled out as a possible

cewicz Dep. Tr. 52). Williams has followed that advice and has reduced his smoking from approximately twenty cigarettes per day to approx-

imately ten per day at the time of trial, and has totally discontinued smoking at periods of time for six months (Tr. 36–38).

diagnosis, Williams' should have been treated *early and aggressively* since he was known to be diabetic. By September 17, 1985, an advanced and "full-blown" infectious process in Williams' right foot had become overt due to the discharge of pus (Tr. 271), and by September 19th Williams' substantially elevated white cell count was loudly sounding the alarms of a severe infection. But unfortunately, there was still a failure of expeditious diagnosis and timely, competent care at Otisville.

The earliest appearance of gangrene was September 28, 1985, nine days later, and even well before the occlusive process and ischemia became the focal point of Dr. Ellison's treatment shortly after September 23rd, Williams' infection had already been permitted to spread and become far advanced due to the misdiagnosis and improper treatment of Otisville—particularly from September 17 to September 23, 1985, during the period when a limb-threatening infection in a diabetic patient was clearly presented.

The court finds that the failure of Otisville to conform with the most fundamental standards of proper diagnosis and treatment applicable to diabetic foot infection up to and including September 23, 1985, when Williams was transferred to Horton Hospital as an emergency patient for intravenous antibiotic treatment, but unaccompanied by any medical records from Otisville, was the sole proximate cause of the development of gangrene necessitating the amputation of his right leg. Hence, even assuming *arguendo* that plaintiff had some degree of diabetic circulatory insufficiency and peripheral neuropathy in his right leg and foot (which the court finds to have been minimal),[54] *but for* the mismanagement by the Otisville medical staff of the infectious process in his right foot, from September 6 to September 23, 1985, as described above, plaintiff would not have later developed gangrene necessitating the amputations of his toe and foot on September 28 and 30, 1985, respectively.

Williams' intravenous drug use (which occurred prior to a diagnosis of his diabetes in 1979 or 1980) and cigarette smoking in 1985, while extremely unwise even for a nondiabetic patient, did not in Williams' case cause, invite, make plaintiff more susceptible to, or significantly aggravate or contribute to the course of the E. Coli infectious process, and obviously did not produce the gangrene necessitating the amputation. Nor did Williams' drug and smoking experience impair the diagnosis or treatment of his infection in September 1985 by Otisville.

In considering the applicable standard of care owed to plaintiff in this case in relating to his foot infection, it is highly significant that defendant's medical staff at Otisville was well aware Williams was a diabetic and smoked, and consequently should have appreciated that Williams was at a much *higher risk* for vascular complications and hence limb-threatening infections in his feet and legs than the general inmate population. Indeed, Dr. Boxhill himself characterized Williams as a "sitting duck" for an amputation if he had a foot infection (Tr. 574–75). Whether or not in terms of actual risk, Dr. Boxhill's "sitting duck" characterization accurately applied to Williams' particular condition, at least up to September 17, 1985 (when the infectious discharge first appeared and Williams was then treated for infection), Otisville failed totally to demonstrate the requisite heightened "index of suspicion" and alertness to the possibility of infection for a diabetic patient with Williams' foot pain and related symptoms. As discussed above, even after September 17th, when an infection in Williams' foot was obvious, Otisville's care and treatment of Williams was far below the basic standards applicable to the diabetic patient with a foot infection.

---

**54.** As indicated *supra,* there was no competent testing of Williams' feet at Otisville to rule out diabetic neuritis. In an examination of Williams' left leg conducted by Dr. Lord, the latter demonstrated that Williams had no signs of diabetic neuritis even at that point in time, some ten years after the onset of Williams' diabetes. Diabetic neuritis is a systemic disease and bilateral in nature, and the record negates diabetic neuritis in the amputated limb (Tr. 215–217).

Williams was at all relevant times a ward of the government. The facts of his diabetic condition and smoking habit (which in combination carried potentially serious medical consequences if Williams developed a sufficiently severe foot infection) were well known to Otisville; the medical data regarding Williams' complaints, symptoms, tests, laboratory reports, treatments, etc. were peculiarly within the control of the government as Williams, unlike more typical Federal Tort Claims Act litigants, *was not free—nor did he have the resources—* to fend for himself and obtain consultation or treatment with a private physician. Although as "Chief Medical Officer" at Otisville, Dr. Rossi never personally held himself out as having any special expertise in the treatment of diabetic patients (especially one with a severe foot infection), nonetheless, defendant undertook to provide *specialized medical care for its diabetic inmates* in its in-house diabetic clinic at Otisville, and therefore, defendant was bound to observe the special standards of care applicable to the treatment of the diabetic infected foot.

If it became necessary because of the limited expertise of the medical staff at Otisville or its inadequate diagnostic testing and treatment facilities, Otisville was required to promptly seek competent assistance outside the institution, and defendant's medical personnel were obligated to exercise prudent judgment in that regard. The court concludes that Otisville failed in such vital regard until September 23, 1985 when by that date Dr. Ellison's chances of saving Williams' leg were almost negligible.[55]

The court also considers as important in this case the fact that Williams was sent by Otisville to Horton Hospital for intravenous antibiotic therapy for his E. Coli infection (which Otisville was not equipped to provide). But as aptly put by Dr. Lord,

unfortunately Horton Hospital and Dr. Ellison were unaware of that fact and "had to fly blind" when hours counted (Tr. 250). Thus, unfortunately, Williams was never provided by Dr. Ellison with the intravenous antibiotic treatment for which he was transferred to Horton. However, in New York, as in most other States, the "rule is now well established that a wrongdoer [Otisville] is liable for the ultimate result, though the mistake or even negligence of the physician who treated the injury [*i.e.*, Dr. Ellison] may have increased the damage which would otherwise have followed from the original wrong." *Ferrara v. Galluchio*, 5 N.Y.2d 16, 176 N.Y. S.2d 996, 152 N.E.2d 249 (1958), quoting from *Milks v. McIver*, 264 N.Y. 267, 270, 190 N.E. 487, 488. "It is only where the causal connection between the original injury and the ultimate damage may be said to be 'too tenuous' that the original wrongdoer will be freed from liability for the ultimate damage." *Id.* (quoting in part).

A defense that the physician is not liable if he exercised his "best judgment" is unavailing in a case like the present where judgments were predicated on cursory clinical examinations, inadequate and improper diagnostic testing procedures and equipment, and failure to give due regard to the patient's history, symptoms and complaints at each visit to the clinic. Only if Williams had received the benefit of the acceptable standard of diagnostic care for a diabetic patient exhibiting Williams' symptoms, and provided treatment in accordance with the basic standards, as articulated by Dr. Lord, would there be no liability by defendant for a mere mistake in judgment in making a faulty diagnosis. *See and cf. Hicks v. United States*, 368 F.2d 626 (4th Cir.1966).

Whether it was because the medical staff at Otisville was inadequately trained in the care of diabetic foot disease, inadequately equipped to employ proper diagnostic meth-

---

55. Dr. Rossi's intention to await and consult with Dr. Brooks did not help Williams since his leg was amputated before Dr. Brooks visited Otisville. Further, Dr. Rossi's judgment that he should consult with an oncologist (cancer specialist) in the case of a diabetic is mind-boggling. Absent any other explanation, it is appar-

ent to the court that Dr. Rossi's principal concern was to simply have another physician confirm Dr. Rossi's expressed suspicion of malingering by Williams, not in obtaining effective diagnosis and treatment by a competent specialist for a diabetic foot problem.

odologies, or was simply indifferent, or a combination of all of the foregoing, the record of this case abundantly establishes Williams' claims by a preponderance of the evidence.

The court wishes to make perfectly plain that the result reached in this case should not be construed as any kind of generalized blanket disparagement or condemnation of medical care in the federal prison system, or even at Otisville. Every claim of negligence under the Federal Tort Claims Act must be decided on the facts of the particular case and under the applicable local law, as provided by the statute.

The record in this case reflects that at Otisville, Williams was generally furnished very abundant, considerate and for the most part quite competent medical services. Unfortunately, the court deeply regrets that it is unable to commend the medical care Williams received in regard to his foot infection, which the court determines failed to meet the requisite standard of care and skill required in the case of a diabetic patient. Such failure was the proximate cause of the advanced infection, necrosis, development of gangrene and ultimately the amputation of Williams' leg.

A principal concern of defendant in its post-trial briefing in this case is that Williams was a convicted felon, a former drug and alcohol user, and therefore his testimony is not worthy of belief.[56] Defendant's strategy in defending this case has, unfortunately, been misfocused on Williams' criminal record and Rule 609, and is puzzling in view of the court's rulings at trial. Since at trial, it was apparent defendant heavily relied upon Rule 609, the court *sua sponte,* raised the ten year time limitation in the Rule and served notice that such portion of the rule would be adhered to and ruled: "any matter involving convictions after 10 years, as stated in more detail under 609(b), will be stricken from the record" (Tr. 142–43). The court cannot agree with defendant's contention that the

probative value of Williams' conviction record over ten years old outweighs its prejudicial effect. Accordingly, the court's exclusion ruling under Rule 609 (Tr. 143) will be adhered to.

In any event, the court's decision in this case is based not only on the credibility of Williams' testimony (notwithstanding Williams' criminal background, the court was favorably impressed by his demeanor and conduct at trial; Williams appeared to be truthful, candid, and straightforward, and accordingly, quite credible), but also on the voluminous documentary evidence (most of which was generated by defendant), the deposition testimony of the defendant's physician assistants and Chief Medical Officer, the testimony of the excellent expert witnesses in this case, and the nature of Williams' amputation.

Understandably, Williams' recollection of specific dates and the sequence of events occurring in 1985, for which Williams had not personally kept detailed records, varied from his medical records, but not materially or critically so. Where there was a variance between Williams' recollection of events and his medical records, the court's Findings of Fact rely almost entirely on the documentary evidence, the evidence adduced through defendant's physician assistants and the expert testimony of Drs. Lord and Boxhill.

## DAMAGES

As the court has determined the issue of liability adversely to defendant, what remains is a determination of the amount due Williams as damages. It is the sole responsibility of the court in this nonjury case to determine, on the basis of the evidence presented, an appropriate award.

In *Howard v. Lecher,* 42 N.Y.2d 109, 366 N.E.2d 64, 397 N.Y.S.2d 363 (1977), Judge Wachtler, writing for the Court of Appeals of New York, observed:

In order to provide a party who has been injured through the negligence of another with some measure of redress

---

**56.** In that connection, defendant offered in evidence records of Williams' convictions for various crimes deemed by defendant to reflect on his credibility as a witness in accordance with Rule 609. As an indication of the importance attached to Williams' credibility at trial, eight out of fourteen of defendant's proposed conclusions of law in this case address Williams' criminal record and his impeachment under Rule 609.

for the wrong inflicted upon him, a rule of law has evolved allowing that party to recover money damages as compensation for the injuries sustained. * * * This, of course, is based on the legal fiction that money damages can compensate for a victim's injury. Although this device is as close as the law can come in its effort to right the wrong, it is still, nevertheless, a fiction for money will not replace or repair the lost or broken limb or remove the disability caused * * *. Where a party's negligence is directly responsible for physical injury to another, there is no question but that the injured party may recover both for the actual physical injury sustained and for the concomitant mental and emotional suffering which flow as a natural consequence of the wrongful act * * *.

397 N.Y.S.2d at 364, 366 N.E.2d at 65.

Patently, no monetary award can replace one's right leg. As in any case where the injury to be compensated for by money is loss of a limb, evaluation in a particular case is fictional, never capable of precise quantification, but nevertheless within broad limits subject to objectivity.

■ In this connection, plaintiff has, appropriately, called the court's attention to awards of the New York courts, since the substantive law governing the rights of the parties is the law of New York. Although it is inherently difficult to compare the award for personal injuries in one case with that in another because there are many variables and all the pertinent facts are rarely the same, awards for similar injuries in prior cases are of some comparative value, and at least give some guidance regarding the range of lower and upper figures. See *Martell v. Boardwalk Enterprises, Inc.*, 748 F.2d 740 (2d Cir.1984).

■ Generally, the pertinent factors which must be considered in quantifying damages for a personal injury involving amputation of a limb are: plaintiff's extent of recovery and general physical and mental condition before and after the amputation, including past and future physical pain, suffering and mental anguish (including any future residual psychological or emotional problems having their genesis in

or exacerbated by the amputation); the nature of and extent of the amputation (here, a below-the-knee amputation of the right leg); plaintiff's life expectancy at the time of the amputation; occupational status at the time of the amputation and loss of earnings or profits; impairment of vocational skill or employability; impairment of avocational skills and enjoyment of life; disfigurement resulting from the amputation; past and future medical expenses, including those for future complications; cost of prostheses and the expenses for future replacements; and any other losses or special damages flowing from the injury. See Annotations: "Excessiveness or Adequacy of Damages Awarded to Injured Person for Injuries to Arms, Legs, Feet, and Hands," 11 A.L.R.3d 9, 43–44, 259–265 (1967); supplemented in "Excessiveness or Adequacy of Damages Awarded for Injuries to Legs and Feet," 13 A.L.R.4th 212, 220, 290–294 (1982).

At the outset, it should be emphasized that plaintiff has proved no special economic damages. Obviously, all of Williams' physician, hospital and other medical bills incurred during incarceration were paid by defendant, and there has been no showing concerning such future expenses. Similarly, no proof was submitted concerning lost earnings, loss of earning ability or employment opportunities, past or future. In short, on the record before the court, no special damages for economic loss, past or future, will be awarded in this case.

■ The court now turns to an appropriate award for pain and suffering, past and future. Many of the pertinent facts touching on Williams' physical pain and suffering are set forth above in the Findings of Fact and need only be briefly reviewed here for purposes of addressing the basis for the award.

Consistent with the Findings of Fact, foot pain and tenderness with difficulty in walking were repeatedly reported to the medical staff by Williams during the period of September 6th to September 23, 1985, when Williams was transferred to Horton. From September 17 to 23, 1985, Williams suffered from an infectious drainage, from his foot, which at one point contained blood. During this period of time, walking

for Williams became increasingly painful and difficult, but despite these facts, Williams was required to walk from his cell to the cafeteria and clinic several times a day (a distance equivalent of several city blocks) to obtain his meals, medication, and whirlpool soaks, which necessitated the use of a cane and then crutches. On or about September 17th, during one of his agonizing walks to the prison hospital, Williams was febrile and perspiring profusely. By the time he arrived at the hospital, he felt as though he were going to faint. To ameliorate his intense pain, Williams was prescribed painkilling drugs: initially, Motrin and subsequently, a very powerful narcotic analgesic agent, Darvocet (Rossi Dep. Tr. 121) that is medically indicated only in cases of significant pain.

On September 23, 1985 Otisville transferred Williams to Horton Hospital for intravenous antibiotic therapy, but he was not given the I.V. treatment for which he had been transferred by Otisville because Otisville failed to forward his medical records. Williams' foot condition continued to deteriorate and he had to undergo painful debridements of necrotic flesh and drainage until September 28th when the fifth toe of his right foot had become so blackened, necrotic and gangrenous that amputation of the toe was imperative to save his foot and right leg.

Finally, by September 30, 1985 Williams' condition had worsened to the point where he had no choice but to consent to and undergo an amputation by Dr. Ellison of his gangrenous right leg below the knee. Hence, Williams underwent two separate amputations while at Horton Hospital. At that point in time, Williams was 48 years of age and had a life expectancy of 24 years. Now at age 53 Williams can be expected to live for 20.5 more years, that is until the age of 73.5 years. Williams' life expectancy is based only on statistical averages as set forth in tables published by the United States Government.[57] Absent evidence that Williams will have a shorter life expectancy due to his diabetic condition,

smoking and former alcohol and drug use, these statistical tables are a useful guide in determining an appropriate award of damages.

The operative report of Dr. Ellison states that Williams had a "swollen, blistered, infected right foot" upon arrival. Williams testified his pain was so intense at that time that "* * * if I had a pistol I would have shot the foot off" (Tr. 132).

After leaving Horton Hospital, Williams was sent to the Medical Center for Federal Prisoners in Springfield, Missouri, where he remained for 107 days, from October 9, 1985 to January 24, 1986. This period of time was obviously traumatic, physically painful and mentally distressing, involving a transition from walking on a natural right leg to walking on a prosthesis, initially with crutches and a cane, and eventually unassisted.

During this period of time, Williams right stump began to shrink as it healed, and he was fitted with a temporary artificial leg, consisting of a plastic cast with a rod and "foot" attached. It was on such prosthesis that Williams learned to walk again assisted by a cane (Tr. 67). Following the amputation, Williams suffered "phantom limb pains" (described *supra*), sharp pains "that would grab at you occasionally" and "constant throbbing and pain" related to changes in the weather (Tr. 69), but he had no other complaints (Tr. 68–9). When the shrinking process stabilized, Williams was fitted with a permanent prosthesis, and underwent physical therapy to learn to walk on it and rebuild the muscle tissue in his right thigh that had atrophied during his rehabilitation (Tr. 70).

When Williams began ambulating on the prothesis, he experienced patellar (knee) pain in October and November 1985 due to the rubbing movement of the prothesis against his stump and the shrinkage and expansion of his right thigh causing irritation and blisters, "which is almost like a piece of sand, pebble within the shoe" (Tr. 78). Williams must remove the prosthesis

---

**57.** *See National Data Book and Guide to Sources, Statistical Abstract of the United States, 1988, 108th Ed., U.S. Department of Commerce, Bureau of the Census:* Vital Statistics, Table No. 109, Expectation of Life and Expected Deaths, by race, sex and age: 1985 (Source: U.S. National Center for Health Statistics, Vital Statistics of the United States, annual.)

for periods of time once a month or every other month and walk with crutches to allow the sores to heal (Tr. 78–79).

It suffices to state the record in this case reflects that the process of learning to use a prosthesis (with and without the assistance of crutches and cane) was a painful experience for Williams, both physically and emotionally, during the period of October 1985 to January 1986. Further, the record shows that from time to time since such period of time, Williams has had various problems with his stump, including superficial infections, ulcerations, and pain on walking.

Williams tries to walk without the assistance of a cane or crutches,[58] but must have such assistance if he walks more than four or five city blocks (Tr. 76–77). Thus, explained Williams: "After a period of maybe four blocks, I begin to walk with a limp or favoring one leg more so than the other. So after a while I am walking out of balance. So I have to stop, and I sit down or stand there until I am feeling that I can continue to walk and start to walk normal again. So, usually I use the cane or the crutch so that I kind of stay more within balance" (Tr. 76). In essence, then, Williams can walk without a cane or crutches for up to four or five city blocks (Tr. 77), and physically, he has made an excellent recovery from his amputation.

Williams testified that prior to the amputation, he engaged in bike riding, swimming, roller skating and jogging, which activities he is now unable to perform (Tr. 79–80).

The damages awarded to plaintiff must, in addition to compensating him for physical pain and suffering, be founded on his prior and probable future mental pain and suffering as demonstrated by the facts of record, including that suffered at Otisville, Horton Hospital and at Springfield, and the permanent residual pain and suffering from the disfigurement and use of a prothesis for ambulation incident to a below-the-knee amputation. The evaluation of this type of damages is inherently difficult, and must be determined on a case by case basis. While the evidence shows that Williams experienced acute psychological problems relating to the amputation and transition to walking on a prosthesis unaided by a cane or crutches, the record does not show that Williams has suffered any exceptional, unexpected or abnormal mental or psychological pain and suffering that would not be inherent in the amputation of his leg and its sequelae.

Williams' background has been considered for the purpose of assessing the potential for the amputation to have already affected or to prospectively affect Williams' emotional or mental state. Williams, as we have seen, has spent most of his adult life as a prison inmate; he has a history of long intravenous drug and alcohol use making him more susceptible to psychopathology than members of the general population not so afflicted; he was unable to hold a steady job during periods of time he was not incarcerated; and he has now suffered from diabetes for approximately ten years and continues to smoke, but his diabetes appears to be under control. The extent to which the amputation and its sequelae (disfigurement, disability, pain, limitation on his activities involving mobility, etc.) make Williams more likely to resume his drug and alcohol use, or make it more difficult to find and keep steady employment, or exacerbate already existing psychological or physical disorders are matters that are scarcely susceptible to definitive proof. In any case, the record is totally bereft of expert testimony in those regards.

Finally, consistent with the determination, *supra*, that Williams' use of cigarettes, and former use of narcotic drugs and alcohol had no direct or contributory role in the infectious process, gangrene and necessity for amputation, the court holds that those factors had no direct or contributory role in Williams' pain and suffering.

In his post-trial brief, plaintiff requests an award of $1,500,000 in light of the awards for pain and suffering in prior New York cases involving below-the-knee ampu-

---

**58.** The court observed at the trial that Williams walked satisfactorily in and around the courtroom unassisted by a cane or crutch, and he obviously takes pride in his ability to ambulate with his prothesis without the use of a cane or crutch (Tr. 76–77).

tations called to the court's attention by plaintiff.[59] These cases have been carefully reviewed, and the court has taken into account the dates of the decisions and an inflationary factor. Based on all the facts and circumstances disclosed by the present record, an award to plaintiff of $500,000 (without any offset for comparative negligence) is clearly justified for his past and future pain and suffering and for the loss of his leg. See and compare the recent decision of the New York Court of Claims in *Matheny v. State of New York*, No. 77431 (N.Y.Ct.Cl. filed June 27, 1990) (in medical malpractice action, court awarded damages in the sum of $550,000 for pain and suffering incurred by 64 year old claimant who was a prison inmate at the time of a below-the-knee amputation of his right leg for peripheral vascular disease where prison medical staff failed to timely send inmate for surgical consultation).

The Clerk is directed to enter judgment for plaintiff in the sum of $500,000.00 in accordance with Rule 58, Fed.R.Civ.P.

---

**59.** See e.g., *Matheny v. State of New York, Kardanis v. Velis*, Vol. V, New York Jury Verdict Reporter (NNYJVR) 11–20 (1986), aff'd. without opinion, 133 A.D.2d 1017, 519 N.Y.S.2d 910 (1st Dept.1987) (jury award of $1,750,000 for pain, suffering and permanency due to below-the-knee amputation resulting from infection and gangrene after minor surgery for an ingrown toenail by orthopedic surgeon, reduced by trial court to $1,000,000 affirmed; jury rejected defendant's contention that plaintiff, who had peripheral vascular disease and was a heavy smoker, would have suffered severe vascular compromise in her lower leg even if she had not undergone the surgery); *Novell v. Carney Electric Construction Corp.*, 123 Misc.2d 1089, 1090, 1096–97, 476 N.Y.S.2d 241, 244, 247–48 (Sup.Ct. N.Y.County 1984) (apparently reducing award for pain and suffering from loss of leg from $7,000,000 to approximately $630,000); *Crisher v. Spak*, 122 Misc.2d 355, 471 N.Y.S.2d 741 (1983) ($1,500,000 award for right below-the-knee amputation resulting from undiagnosed malignant tumor); *Mashburn v. Ratzan*, Vol. II, KYJVR 8–2 (1983) (jury awarded $1,686,800 to 44–year old man who suffered below-the-knee amputation as a result of auto accident and alleged medical malpractice); *Brice v. City of New York*, Vol. III, NYJVR 3–28 (1983) ($750,-000 award to 74–year old man who was a latent diabetic and suffered a fracture after a slip and fall; site became gangrenous and leg was amputated four inches below the knee; settled for $675,000); *Warmsley v. City of New York*, 89 A.D.2d 982, 454 N.Y.S.2d 144 (2d Dept.1982) ($2,000,000 jury verdict upheld for 43 year old woman who suffered a below-the-knee amputation after automobile accident); *Purcell v. Doherty*, 102 Misc.2d 1049, 424 N.Y.S.2d 991 (1980) ($775,000 award to male who suffered a left below-the-knee amputation after auto accident); *Marcus v. Lee*, 23 A.T.L.A.L.Rep. 257 (1980) (settlement of $750,000 to 21 year old male who suffered an amputation at the knee after motorcycle crash; plaintiff was a high-school drop-out who was unemployed for a year before the accident and had no skills or career goals). Also cf. *Prata v. National Railroad Passenger Corp.*, 70 A.D.2d 114, 420 N.Y.S.2d 276 (1st Dept. 1979) (reducing award for loss of hand from $1,250,000 to $700,000); *Martell v. Boardwalk Enterprises, Inc.*, 748 F.2d at 753 ("the guidance we receive from the recent New York cases is that the awards condoned for the loss of a single limb have ranged from $325,000 to $810,00011; $2,000,000 award by jury for amputation of left arm and other relatively minor injuries reduced on appeal to $1,200,000).